Argued and submitted September 14, 1981 Or Laws, ch 261, Relating
to the Apportionment of Senators and Representatives does not
comply with subsection (1) of Or Const, Art IV, section 6,
and is therefore null and void September 23, 1981

McCALL et al,
*Petitioners,*
*v.*
LEGISLATIVE ASSEMBLY,
*Respondent.*

IVANCIE et al,
*Petitioners,*
*v.*
PAULUS,
*Respondent.*

LEAGUE OF WOMEN VOTERS OF
PORTLAND et al,
*Petitioners,*
*v.*
LEGISLATIVE ASSEMBLY,
*Respondent.*

SCHULTZ,
*Petitioner,*
*v.*
LEGISLATIVE ASSEMBLY,
*Respondent.*

BOTTERI,
*Petitioner,*
*v.*
PAULUS,
*Respondent.*

GOLDSTEIN,
*Petitioner,*
*v.*
LEGISLATIVE ASSEMBLY,
*Respondent.*

CARGO et al,
*Petitioners,*
*v.*
LEGISLATIVE ASSEMBLY,
*Respondent.*

(Nos. 28016, 28042, 28045,
28061, 28064, 27946, 28054)

634 P2d 223

Rex Armstrong, Portland, argued the cause and filed a brief for Tom McCall, et al., petitioners on review.

Christoper P. Thomas, City Attorney, City of Portland, and Penny L. Davis, Portland, argued the cause and filed a brief for Francis J. Ivancie, et al, petitioners on review.

Doug Gordon, Portland, argued the cause and filed a brief for The League of Women Voters, petitioners on review.

Paul J. Speck, Bend, argued the cause and filed a brief for Norman R. Schultz, Jr., petitioner on review.

Richard M. Botteri, Portland, petitioner on review, argued the cause and filed a brief on his own behalf.

Bob Goldstein, Portland, appeared on his own behalf.

David F. Cargo, Portland, filed a brief on behalf of his petitioners on review.

David B. Frohnmayer, Attorney General, State of Oregon, argued the cause for respondents. With him on the brief were Stanton F. Long, Deputy Attorney General, William F. Gary, Solicitor General, and Timothy Wood, Assistant Attorney General, Salem.

LINDE, J.

Peterson, J. and Tanzer, J., filed specially concurring opinions.

## LINDE, J.

In 1952, the people of Oregon initiated and adopted a constitutional amendment to assure themselves of a constitutional apportionment of the Legislative Assembly after each federal census. The amendment provided for review by this court of challenges to a reapportionment measure enacted by the Legislative Assembly, for preparation of a reapportionment by the Secretary of State if the assembly enacts no reapportionment measure or enacts a faulty one, and for further review by this court of any reapportionment thus prepared by the Secretary of State. Or Const Art IV, § 6. The present proceeding concerns the first of these steps, review of the reapportionment measure enacted by the Legislative Assembly and signed by the governor on June 30 of this year. 1981 Or Laws ch 261.

### *The scope of review*

It is important to state our exact task in this proceeding in more detail. This is not an ordinary lawsuit. The 1952 amendment of Article IV, section 6, vested original jurisdiction in this court, upon the petition of any qualified elector, to determine whether a reapportionment made by the legislature or by the Secretary of State complies with subsection (1) of that section.[1] Other issues may arise in different legal proceedings. The present issues, however, are defined by the grant of original jurisdiction.

Our review therefore is directed to compliance with Article IV, section 6(1). This does not avoid difficult problems of constitutional interpretation. In the last such proceeding, ten years ago, the court decided that the people intended to secure compliance with subsection (1) of Article IV, section 6, to the extent consistent with binding federal standards, on that occasion the so-called one person, one vote standard under the equal protection clause of the 14th

---

[1] Some of the petitioners named the Legislative Assembly and Norma Paulus, Secretary of State, as respondents in their petitions; others named only the Legislative Assembly or the Secretary of State as respondent. The Attorney General appeared on behalf of both the Legislative Assembly and the Secretary of State. Because he appeared for both, there is no occasion to decide who should be parties.

amendment.[2] The court therefore held that its jurisdiction extended to directing the Secretary of State to depart from subsection (1) when necessary to comply with this constitutional mandate. *Hovet v. Myers,* 260 Or 152, 159-61, 489 P2d 684 (1971). On familiar principles, also, the terms of subsection (1) itself must be interpreted and applied in harmony with other provisions of the Oregon Constitution. It therefore is not beyond the directive of section 6(2) to consider other constitutional provisions that shed light on subsection (1), especially provisions concerning the relation between legislators and citizens. It nonetheless is subsection (1) we interpret.

In the task of redistricting that resulted in the plan before us, chapter 261, the Legislative Assembly was bound by several constitutional constraints. The reapportionment had to provide ratios between the population of any district and the numbers of senators or representatives apportioned to that district which would come as close as realistically feasible to the ratios between the state's total population and the total numbers of senators and representatives. Presently the prescribed membership of the senate and house is 30 and 60, respectively. ORS 188.210 to 188.240. These numbers could be reduced but not increased without constitutional amendment.[3] Assuming the established membership for each house, the 1980 census figures called for population ratios of 87,755 for a senator and 43,878 for a representative. The ratio could be met by single member districts or by multimember districts, provided

---

[2] US Const Amend XIV, § 1:

"No State shall. . . deny to any person within its jurisdiction the equal protection of the laws."

*See Reynolds v. Sims,* 377 US 532, 84 S Ct 1362, 12 LEd2d 506 (1964).

[3] Or Const Art IV, § 2:

"The Senate shall consist of sixteen, and the House of Representatives of thirty four members, which number shall not be increased until the year Eighteen Hundred and Sixty, after which time the Legislative Assembly may increase the number of Senators and Representatives, always keeping as near as may be the same ratio as to the number of Senators, and Representatives: Provided that the Senate shall never exceed thirty and the House of Representatives sixty members."

the rules respecting county lines were honored.[4] Furthermore, senators are elected for four-year terms, one half of the prescribed membership to be elected every second year.[5]

## The reapportionment measure

The paper rules of the state and federal constitutions do not produce an apportionment. The difficult practical task is to apply these rules to the realities of the state's geography, its economy, the local entities that administer many state programs, the shared social concerns that exist within and those that exist across local boundaries, and the networks of transportation and communications that link separate localities into larger communities. To accommodate such variables in constituting an elected legislature for a decade goes beyond constitutional law to the essence

---

[4] In *Hovet v. Myers, supra,* the court stated:

"We interpret these provisions to require: (1) that county lines be adhered to; (2) that all counties entitled to a whole number or whole numbers of senators or representatives cannot be combined to form a district, but each of such counties is entitled to the number of legislators equivalent to whole numbers in the county; (3) that counties having a major fraction are entitled to one senator or representative, except that major fractions can be adjusted consistent with the overall design, *In re Legislative Apportionment, supra* (228 Or at 573); (4) that counties with less than a whole number can be joined with other counties having a minor or major fraction or a whole number to form a district; and (5) only adjoining counties may be combined to form a district."

"The requirement that counties having one or more whole numbers cannot be combined with each other to form a district is not stated expressly. We agree with the Secretary, however, that the language of §§ 3, 6 and 7, of Art IV, evidences a clear constitutional intent that counties entitled to at least one legislator are not to be combined with other similar counties to form a multi-member district. The petitioners have not argued to the contrary."

260 Or at 156-157.

[5] Or Const Art IV, § 4:

"(1) The Senators shall be elected for the term of four years, and Representatives for the term of two years. The term of each Senator and Representative shall commence on the second Monday in January following his election, and shall continue for the full period of four years or two years, as the case may be, unless a different commencing day for such terms shall have been appointed by law.

"(2) The Senators shall continue to be divided into two classes, in accordance with the division by lot provided for under the former provisions of this Constitution, so that one-half, as nearly as possible, of the number of Senators shall be elected biennially.

"(3) Any Senator or Representative whose terms, under the former provisions of this section, would have expired on the first Monday in January 1961, shall continue in office until the second Monday in January 1961."

of constitutional politics. Before the 1980 census, the Legislative Assembly addressed in advance the criteria to govern the forthcoming reapportionment. In 1979 Or Laws ch 667, now ORS 188.010, the legislature stated:

> "The Legislative Assembly or the Secretary of State, whichever is applicable, shall consider the following criteria when apportioning the state into congressional and legislative districts:
> "(1) Each district, as nearly as practicable, shall:
> "(a) Be contiguous;
> "(b) Be of equal population;
> "(c) Utilize existing geographic or political boundaries;
> "(d) Not divide communities of common interest; and
> "(e) Be connected by transportation links.
> "(2) No district shall be drawn for the purpose of favoring any political party, incumbent legislator or other person.
> "(3) No district shall be drawn for the purpose of diluting the voting strength of any language or ethnic minority group.
> "(4) Two state House of Representative districts shall be wholly included within a single state senatorial district.
> "(5) A state senatorial district shall be wholly included within a single congressional district, when practicable."

The reapportionment measure enacted in 1981, chapter 261, originated in the House of Representatives as House Bill 2001. The bill continued the existing use of single member districts in both house and senate, with each senate district composed of two house districts. Two other provisions of HB 2001 are important in the case before us.

The bill itself carried an effective date of July 1, 1981, (§ 8), but § 7, as passed by the house, provided:

> "This Act shall not become operative until the day of the regular general election in 1982, except that it shall be operative prior thereto for the purpose of nomination of candidates to be voted upon for the office of Senator or Representative at the regular general election in 1982."

Also, section 6 of the bill as passed by the House provided: "The following senatorial districts shall be served by the

senators elected for terms ending in 1985 from the former senatorial districts:. . . ," followed by a list matching 15 old and new senate districts. In other words, the preexisting legislative districts would remain in effect until the day of the 1982 general election, when 60 representatives and 15 senators would be elected from the newly formed districts. Each of the 15 other newly formed senate districts would be "served" by a holdover senator from a previous senate district specified in the bill.

The senate made a number of changes in HB 2001, but sections 6 and 7 remained as stated above. When HB 2001 was sent to a conference committee of the two houses to adjust the differences, however, it emerged with the provision for the assignment of holdover senators to new districts stricken from the bill and the following substituted in sections 6 and 7:

"SECTION 6. Notwithstanding ORS 260.542, the following may use the term 'reelect':

"(1)   A member of the Senate who served in the Sixty-first Legislative Assembly and who is a nominee or candidate for nomination or election in 1982 or 1984 to the Senate.

"(2)   A member of the House of Representatives who served in the Sixty-first Legislative Assembly and who is a nominee or candidate for nomination or election in 1982 to the House of Representatives.

"SECTION 7. This Act shall not become operative until the day of the regular general election in 1982, subject to the following:

"(1)   It shall be operative prior thereto for the purpose of nomination of candidates to be voted upon for the office of Representative in 1982 and for the office of Senator in 1982 in the following senatorial districts: 1, 3, 5, 9, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22 and 26.

"(2)   All other senatorial districts shall be filled by election in 1984. No vacancy shall be considered to exist in such districts in 1982."

The conference committee's version of HB 2001 was accepted by both houses and signed by the governor.

The resulting reapportionment measure, chapter 261, is challenged on a variety of grounds in petitions filed under Article IV, section 6(2). The most prominent target

is the treatment of a senate district in Multnomah County, which includes most of the City of Portland west of the Willamette River. Almost all of the district consists of the present Senate District 5, a district that last elected a senator in 1978 for a term expiring in 1982. Chapter 261 forms a new District 6 by adding to this existing district some adjoining census tracts required to meet the new population ratio. The measure provides that the new District 6 (with 14 others) shall first "be filled by election in 1984," that is to say, six years after the last time the electorate of the predecessor district voted for a senator and two years after the end of that senator's term. This treatment of the transition is challenged by one group of the present petitioners, headed by former Governor Tom McCall, by a second group composed of Portland Mayor Francis J. Ivancie and four city commissioners as well as representatives of various neighborhood associations, by petitioner Hudson, president of The League of Women Voters, and by petitioner Richard M. Botteri. Another group of petitioners headed by David F. Cargo adds to this attack on Senate District 6 a separate challenge based on the fact that residents of an area transferred from old Senate District 13 to new Senate District 4 will not be able to vote in a senate election between 1978 and 1984.

Petitioner Norman R. Schultz attacks chapter 261 because it divides the City of Bend and Deschutes County into separate legislative districts. In addition, a general request to review the reapportionment plan was filed by petitioner Bob Goldstein. Certain other contentions presented untimely by petitioners did not enter into the present decision.

### Bend and Deschutes County

We first take up petitioner Schultz's attack on the division of the City of Bend and Deschutes County in chapter 261, because the difficult constitutional issues presented by the other petitioners may be moot if that feature requires rejection of the reapportionment measure. We conclude, however, that the measure survives this attack.

Petitioner contends that the reapportionment of legislative districts in Eastern Oregon was designed to avoid election contests among incumbent legislators from

the present districts, that for this purpose the measure sacrificed the political integrity and the community of interests of the City of Bend and Deschutes County, that an alternative plan would have respected the integrity of these communities at a lower deviation from the prescribed ratio of legislative seats to district populations, and that chapter 261 therefore violated ORS 188.010, *supra,* and the 14th amendment.

The Attorney General, appearing for respondents Secretary of State and Legislative Assembly, counters that the reapportionment measure cannot be reviewed for compliance with ORS 188.010 in this proceeding, that even if ORS 188.010 may be a legal directive to the Secretary of State in preparing a reapportionment, it did not deprive the 1981 legislature of power to enact chapter 261 as a later statute, and that the reapportionment made in chapter 261 complies with 14th amendment standards of equal representation.

■ We agree with the Attorney General's conclusion. As stated above, our original jurisdiction under Article IV, section 6(2) is to review a reapportionment measure for compliance with section 6(1), including such surrounding constitutional mandates as must be respected in the interpretation and application of subsection (1).[6] ORS 188.010 does not purport to be an authoritative interpretation of constitutionally mandated standards. Also, as respondents point out, the alternative districts favored by petitioner would have split more counties than chapter 261.

■ With respect to petitioner's claim under the 14th amendment, we are of course governed by the decisions of the United States Supreme Court. Petitioner concedes that the degree to which the populations of districts created by chapter 261 deviate from the mathematically ideal ratios remains well within limits approved in the

---

[6] We need not now consider the present "statutory" status of chapter 261. Art IV, § 6, describes a reapportionment enacted by the Legislative Assembly as a "reapportionment measure." It describes a reapportionment drafted by the Secretary of State as becoming "law" upon filing with the governor. By the terms of subsection (2), the court will have reviewed a reapportionment drafted by the Secretary of State before "it shall become law;" by the terms of subsection (3), a reapportionment made by the Secretary of State in the absence of a legislative measure is reviewed by the court after it has "become law."

relevant decisions. *Gaffney v. Cummings,* 412 US 735, 93 S Ct 2321, 37 LEd2d 298 (1973), *White v. Regester,* 412 US 755, 93 S Ct 2332, 37 LEd2d 314 (1973). He argues, however, that an alternative plan presented to the Legislative Assembly would have deviated even less from the idea of equal district populations, and he candidly urges us to depart from *Gaffney v. Cummings, supra,* to hold that the choice of the greater deviations must be supported by some more compelling state objective than to avoid election contests among incumbent legislators.[7] Even if we were to disagree with the *Gaffney* opinion about redistricting for political selfprotection, however, we are not free to hold that the federal Constitution forbids what the United States Supreme Court would sustain. We therefore hold that the legislature's division of the City of Bend and Deschutes County between two districts does not render chapter 261 unconstitutional.

### Senate District 6

As stated above, chapter 261 creates a new Senate District 6 which encompasses all of the present Senate District 5 plus sufficient adjoining census tracts to meet the required population ratio. District 5 last elected a senator in 1978, whose term expires at the end of 1982. Although chapter 261 is to "become operative" on the date of the regular general election in November 1982 (and earlier for purposes of nomination of candidates, see § 7,

---

 · [7] According to figures presented by the director of the Legislative Research Office to the Joint Conference Committee on HB 2001, chapter 261 creates an "overall relative range" of 5.34. for house districts and 3.73. for senate districts. None of the parties challenge these figures. (There is considerable discrepancy, however, in the terminology used in this and other reapportionment cases. The term "overall relative range" used in the Director's memorandum apparently refers to what the U.S. Supreme Court called in *Gaffney, supra,* the "total maximum deviation" and in *White, supra,* the "total maximum variation"; that is, the difference between the largest and smallest districts expressed as the absolute value of their combined deviation from the ideal sized district. The Attorney General apparently refers to these figures as the "overall mean deviation," although this phrase is never defined.) The alternative plan, according to petitioner, would result in an "overall relative range" of 1.68. for senate districts and 1.41. for house districts. The U.S. Supreme Court in *Gaffney, supra,* sustained a Connecticut reapportionment plan that had a "total maximum deriative" of 1.81. for senate districts and 7.83.for house districts. The court also upheld, in *White, supra,* the challenged portion of a Texas reapportionment plan which had a "total maximum variation" of 9.9%.

*supra)* the new Senate District 6 first elects a senator in 1984. Criticism and defense of this arrangement have led the parties to probe deeply into the constitutional premises of Oregon's political system.

One line of attack focuses on the six year period that will elapse between the last senatorial election in present District 5 and the first senatorial election in the new District 6. Because in all other new districts most residents will retain the normal four-year term between senate elections, the treatment of Senate District 6 is said to deprive the electors living in District 6 of equal voting rights in violation of Oregon Constitution Article I, section 20 and the equal protection clause of the 14th amendment. This line of attack is stressed by the petitioners representing the City of Portland and the neighborhood organizations, although they also make contentions argued by other petitioners.

■ The Attorney General responds that many voters inevitably face a change in their prior quadrennial voting schedule whenever senate district lines are redrawn in a reapportionment. This is a consequence of the constitutional requirement of staggered senate terms, at least when the senate is apportioned into single-member districts. Some precincts in a district that elected a senator in the last preceding election may find themselves in a new district scheduled to elect a senator within two years. Other precincts will find that their new district is scheduled to elect a senator two years after an election would have been due in their previous district, thereby confronting the six year interval between elections of which petitioners complain. That is true of many other areas of the state besides the old Senate District 5, some of them containing tens of thousands of residents.[8] This effect of redistricting creates no unconstitutional grant of equal privileges or immunities, Oregon Constitution Article I, § 20, or of equal protection of the laws, US Constitution Amendment 14, unless the change in an

---

[8] Petitioner Cargo alleges that the precinct in which he resides, Precinct No. 151, presently part of Senate District 13, faces such a hiatus of voting rights in being assigned to a new Senate District with a 1984 election date.

Respondents refer to Senate Districts 4, 10, and 11, which are said to contain respectively 39,000, 35,000 and 26,000 voters who will miss their previous senate election date for two years.

area's voting schedule is shown to result from some invidious discrimination. Respondents deny any invidious grounds for the assignment of a voting date to the new Senate District 6.

A second line of attack on chapter 261 focuses on the two-year interval between the end of 1982 and the seating of the first senator to be elected from District 6 in 1984, asserting that during this interval District 6 will have neither an incumbent nor a newly elected senator. This argument is stressed by Governor McCall and his fellow petitioners and by the president of the League of Women Voters. They and other petitioners contend that the residents of District 6 and every other district are entitled to identifiable representatives in the Legislative Assembly. They urge that the constitution confirms this reading of Article IV, section 6(1), in provisions securing the freedom to instruct elected representatives, Article I, section 26, and the right to recall them, Article II, section 18.[9]

To this, the Attorney General offers several responses: The basic unit of legislative apportionment specified in Article IV, section 6(1) is the county. A "district" within the meaning of subsection (1) is formed from adjoining counties when a county does not have the population required to elect a representative or a senator of its own. Under *Hovet v. Myers, supra,* different district lines may be drawn to satisfy federal equal protection principles for purposes of elections; nevertheless, after election legislators represent the county or counties constituting their districts. The inhabitants of Senate District 6 share in the six senators representing Multnomah County and a seventh senator which Multnomah shares with Clackamas

---

[9] Or Const Art I, § 26:

"No law shall be passed restraining any of the inhabitants of the state... from instructing their Representatives; ..."

Or Const Art II, § 18:

"Every public officer in Oregon is subject, as herein provided, to recall by the legal voters of the state or of the electoral district from which he is elected."

The section further refers to recall petitions filed by a fraction of "the number of electors who voted in his district" and to a special election to be held "in his said electoral district."

County. Also, according to respondents, petitioners' claims concerning the freedom to instruct one's representatives or the right to recall them are "hopelessly circular." The right of "unencumbered access" to a legislative representative "does not confer a right to have a representative; it merely protects such rights as are conferred elsewhere;" and the right to recall a legislator, in the Attorney General's view, remains with the original election district even when this district has been superseded by a reapportionment.[10]

These opposing contentions present sharply different views of the relationship between a legislator and what in nonlegal terms often is called his or her constituency. They reach issues at the core of competing conceptions of representative government.

There is no more chameleon-like concept in the evolution of political theory than the concept of representation. An absolute monarch might claim to represent a state by being its personal embodiment: *L'etat, c'est moi.* Shakespeare's characters use "England" or "France" to refer to those countries' kings. The essence of representation may be the legal authority of the representative to bind those he represents by his acts, but it is a classic issue whether, once authorized, he owes them his obedience or his best judgment. An assembly may be thought "representative" when its members are selected to "represent" the best of the community's values and abilities, or to champion the community's competing and mutually adverse interests, or to mirror the community in microcosm. Indeed, it is not unknown to find these theories held simultaneously, for use as needed, without awareness of any contradiction.[11]

It is not for this court to pronounce one theory right or another wrong. The issue for the court is whether one or

---

[10] *See* Or Op Atty Gen 364 (1976).

[11] *See generally,* R. Dixon, Democratic Representation: Reapportionment Law and Politics 27-29 (1968); H. Pitkin, The Concept of Representation (1967); Gilbert, *Operative Doctrines of Representation,* 57 Am Pol Sci Rev 604, 614 (1963). A prominent recent illustration has been the effort to accommodate both representation as elected leadership and representation as social microcosm in the makeup of national political conventions. *See* Kester, *Constitutional Restrictions on Political Parties,* 60 U Va L Rev 735 (1974). *See also, Brown v. O'Brien,* 469 F2d 563 (DC Cir), *stayed* 409 US 1, *vacated* 409 US 816 (1972).

another theory of legislative representation has been chosen by the people of Oregon in constructing their constitution. We therefore turn to that question.

*"Representation" under the Oregon Constitution*

The position taken by the Attorney General on behalf of the Secretary of State and the Legislative Assembly draws a sharp distinction between the right to vote and the right to have a particular representative in the house and in the senate. It involves these contentions: Apportionment by districts other than counties is designed only to achieve equal population ratios for purposes of election, to protect equal voting rights. After the election, legislators represent counties, not voters: "There is no direct or indirect support in the Oregon Constitution for the proposition that a senator elected from a 'district' represents that district rather than the county. The concept underlying the Oregon legislative scheme was that the senator would represent the county." Chapter 261 accords Multnomah County the number of senate seats to which it is entitled. As to voting rights, respondents contend that chapter 261 provides all the equality possible in electing senators from single-member districts for staggered four-year terms; the 1981 reapportionment cannot be judged to deny equal voting rights by "tacking the voting schedule under the old apportionment plan onto the new schedule."

There is undeniable substance to the distinction between election and representation. Selection of a legislator by voters and representation of a district are by no means synonymous. If petitioners are right in arguing that under the Oregon Constitution a legislator "represents" an electoral district, then he or she represents all inhabitants of that district, not only those who elected the legislator but also those too young or otherwise ineligible to vote, and opponents as well as supporters. During a senator's four-year term, many who voted in the last election will have died or moved out of the district, others will have moved into the district or become of age to vote in the next election, and yet others will arrive and leave again between elections. Indeed, this entire line of petitioners' attack on chapter 261 depends on the premise that legislators may

represent districts whose boundaries and "constituencies" differ from those in which they were elected.

The distinction between election and representation, however, does not save the defense of chapter 261 from difficulties of its own. Respondents first focused their defense on the relationship between the 15 senators who were elected in 1980 and the 15 senate districts, including District 6, that are scheduled to elect senators in 1984. The argument is that, although each of these 15 new senate districts except District 6 substantially incorporates the residence and the present district from which a "holdover" senator was elected, after 1982 these districts will not be "represented" by an incumbent senator any more than District 6 will be.[12] But respondents' argument cannot confine itself to those 15 senate districts. By its premise, none of the 30 senators represents a district under the present apportionment or after chapter 261 becomes operative with the regular general election in 1982 unless the district happens to coincide with a county; for respondents' premise is that legislators represent counties, not districts or subdistricts within counties. By the same premise, the members of the House of Representatives also represent counties, not electoral districts, now as well as after 1982.

---

[12] A supplemental memorandum states respondents' position as follows:

"(a) No senate district in which an election is to be held in 1982, has an 'incumbent' state senator. The present senator—who may or may not file for re-election—presently serves as an incumbent of a district forged in the 1971 reapportionment; not as the incumbent of a new 1981 reapportionment plan district.

"(b) No present incumbent of an old (1971 reapportionment plan) senate district will file as the legal incumbent in a 'new' 1984 election date senatorial district.[2]

"(c) In short, by operation of law, no 'new' senate district currently has an incumbent, irrespective of the present geographical residence of a state senator elected in 1978 or 1980. District 6 is not treated any differently by operation of HB 2001 than any of the other 14 "new" senate districts with a 1984 election date."

Footnote 2 of the above refers us to section 6 of HB 2001. We are not certain we understand respondents' point. Section 6 of the reapportionment measure, quoted supra, p. 671, provides that a senator who served in the Sixty-first Legislative Assembly (i.e. in 1981) may ask to be "reelected" if he becomes a Senate candidate either in 1982 or in 1984. Representatives may use "reelect" when running in a new district only in 1982. This has no self-evident bearing on whether holdover senators represent any district at all between 1982 and 1984.

In short, respondents present a constitutional model which does not create any special legal relationship of representation between a legislator and an electoral district, whatever political relationship between them may be recognized by the inhabitants of the district, by the legislator, by his or her legislative colleagues, and by other agencies of government. In respondents' words: "We contend that there is no broad and amorphous right of representation in the apportionment context implicit in the Oregon Constitution." That is the issue next to be examined.

Article IV, section 6(1) of the Oregon Constitution provides:

> "The number of senators and representatives shall, at the session next following an enumeration of the inhabitants by the United States government, be fixed by law and apportioned among the several counties according to the population in each. The ratio of senators and representatives, respectively, shall be determined by dividing the total population of the state by the number of senators and by the number of representatives. The number of senators and representatives for each county or district shall be determined by dividing the total population of such county or district by such respective ratios; and when a fraction exceeding one-half results from such division, such county or district shall be entitled to a member for such fraction. In case any county does not have the requisite population to entitle it to a member, then such county shall be attached to some adjoining county or counties for senatorial or representative purposes."

The first sentence states that the "number of senators and representatives shall [be] apportioned among the several counties according to the population in each." Population ratios are used to determine the "number of senators and representatives for each county or district." Perhaps it can be argued that these words still refer only to determining the numbers of legislative seats to be filled by election in a county or district, though they refer to senators and representatives "for" a county or district. But other clauses strain respondents' argument that section 6(1) concerns only the allocation of legislative seats to district ballots at election time. A county or district "shall be entitled to a

member" if it contains a fraction of the required population. It shall be joined with another "for senatorial or representative purposes" if its population does not suffice "to entitle it to a member."

This is not the language of election only. The text says that a county or district shall be entitled "to a member," not merely "to elect a member." A county lacking the requisite population entitling it to "a member" joins a larger district "for senatorial or representative purposes," not "for electoral purposes." These phrases are not conclusive. Draftsmanship rarely is precise enough to preclude every argument about unforeseen issues, as earlier demonstrated by the major fraction provisions of this very section. *See In Re Legislative Apportionment,* 228 Or 562, 364 P2d 1004, 365 P2d 1042 (1961). But when there are such easy and natural ways to express the singleminded concern with the election process that respondents ascribe to subsection (1), it is at least interesting that the drafters not once used the words "elect" or "election." While the operative text may not contradict respondents' position, it lends their position no support.

The original constitution of 1859 plainly contemplated a direct relationship between legislators and constituencies when it provided that only an established inhabitant could be chosen to represent a county or district in the legislature, though the rule was only stated in terms of residency before election. Art IV, § 8.[13] A representative relationship is implicit in the freedom of "instructing their Representatives," Art I, § 26, *supra* n. 12, which was first stated as a "right" in the constitutions of North Carolina in 1776, Vermont in 1777, and Massachusetts in 1780.[14] We do not believe that "Representatives" was meant to refer to members of the House as distinct from senators.

---

[13] Or Const Art IV, § 8 (1859):

"No person shall be a Senator, or Representative who at the time of his election is not a citizen of the United States; nor any one who has not been for one year, next preceeding his election an inhabitant of the county, or district whence he may be chosen. Senators and Representatives shall be at least twenty one years of age."

[14] North Carolina Const Art I, § 12 (1776) provided:

Since 1859 the Oregon Constitution has undergone changes bearing on the nature of legislative representation. An amendment initiated and adopted by the people in 1908 provided for the recall of elected public officers, including legislators. Art II, section 18, *supra* n. 8. As already mentioned, the Attorney General maintains that even after the reapportionment is scheduled to become operative in 1982, recall petitions and elections would be a matter for the electors within the old, otherwise superseded, senate district that originally elected a holdover senator, so that none of the new senate districts with 1984 election dates can recall "its own" senator. The legal merits of that position are not at issue in this case. We do not hold that chapter 261 violates Art II, § 18. We cite the recall provisions only as another item of evidence that Oregon's constitutional system presupposes an ongoing identification between electoral districts and particular legislators.

---

"That the people have a right to assemble together, to consult for their common good, to instruct their Representatives, and to apply to the Legislature for redress of grievances."

Vermont Const Ch I, § XVIII (drafted in 1777, affirmed by the legislature in 1782) provided:

"That the people have a right to assemble together, to consult for their common good—to instruct their representatives, to apply to the legislature for redress of grievances, by address, petition, or remonstrance."

Mass Const Pt I, Art XIX (1780) stated somewhat more elaborately:

"The people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body by way of addresses, petitions, or remonstrances. . . . "

Similar provisions are presently found in 15 state constitutions. Indiana's 1816 constitution, Art I, § 19, originally followed the North Carolina model with the addition of the words "in a peaceable manner;" but its 1851 constitution, Art I, § 31, dropped reference to the statement that "the people have the right" and substituted the opening words "No law shall restrain the inhabitants. . . ." Oregon copied the Indiana provision of 1851.

Massachusetts now provides a procedure for the voters of any senatorial or representative district to submit to the voters of that district "any question of instructions to the senator or representative from that district." If the question submitted receives a majority of votes cast in that district, it "shall be regarded as an instruction under article nineteen of the bill of rights of the commonwealth." MGLA, ch 53, § 22. Obviously, the Massachusetts provision envisions a direct relationship between senators and districts. What obligation, if any, the clauses meant to impose on legislators so "instructed" is another question.

Additional evidence could be cited.[15] But we need not go afield from Article IV, section 6 itself. The 1952 reapportionment initiative under which we conduct the present review also made a new apportionment in section 6(4) to "become operative" on the day of the 1954 general election, much like chapter 261. And section 6(4) left no doubt that senators were to "represent" particular districts aside from being elected in them. Section 6(4)(c) directed that each senator whose term extended to the end of 1956 "shall continue, for the duration of his term, to hold office as senator, representing the district established under [§ 6(4)(a)] in which is located the county in which he resided at the time of his election or appointment," with certain adjustments. With respect to three "holdover" senators in eastern Oregon, section 6(4)(c) directed that the senator "representing" a specified former district "shall continue to hold office and shall represent" specified new districts under the reapportionment that would become operative in 1954. In other words, section 6(4)(c) assigned holdover senators from old senate districts to represent new districts in much the same manner as HB 2001 did before that provision was eliminated by the conference committee. The same device of assigning incumbent senators to newly formed districts had been used in the prior reapportionments of 1899 and 1907. Each provided that "Senators holding over, representing districts composed of more than one county, shall, when the districts have been changed by this act, be considered senators of the districts created by this act in which they reside." 1899 Or Laws, § 5, p. 6; 1907 Or Laws ch 269, § 4.

---

[15] Art IV, § 3, was amended in 1930 to provide that "a vacancy in the office of senator or representative from any county or district. . . shall be filled as may be provided by law." The text appears to presuppose that the *office* is that of a "senator or representative from" a county, district, or (since a further 1954 amendment) subdistrict.

Moreover, when the amendments to Art IV, §§ 3 and 7, allowing subdistricts were submitted to the voters in 1954, the official arguments submitted for the proposal were that without subdistricts candidates in heavily populated counties could not meet or address the voters of "their district"; the argument against the proposal stated that "representatives and senators do represent their entire county or counties and not their own particular area." The adoption of the amendments suggests that the voters approved the theory of subdistrict representation rather than the theory of county and multicounty representation.

The use of this familiar device in the 1952 reapportionment amendment, expressly applying the terms "representation" and "shall represent" to the reassignment of elected and of appointed senators alike, contradicts the Attorney General's view that apportionment deals solely with electoral numbers and that the constitution knows no concept of "representation" in the apportionment context. The historical record of previous reapportionments shows that by including this careful provision for "representation" of reapportioned districts in the 1952 amendment, the people did not introduce a previously unknown and radical innovation into the constitution. Rather, we believe that the provisions for "representation" in section 6(4) reflected existing assumptions about legislative representation. Thus they shed light on the intended object of the provisions in section 6(1) for apportioning the number of senators "among the several counties" and "for each county or district."

■    In short, we conclude that an apportionment under section 6(1), as modified by other constitutional mandates, apportions more than numbers of legislative positions to be filled on election day. It also implies a relationship between electoral districts and identifiable legislators, the relationship which the words "shall represent" in section 6(4)(c) describe as a duty of representation.

The court's inquiry is not whether the idea of representation tied to electoral districts is wise or unwise but whether it is embodied in Oregon's constitutional system.[16] The substance of representation or its sanctions do not concern us here. A legislator's obligation to represent a district may be "amorphous" and the sanctions political, as respondents suggest. We decide nothing concerning residence requirements or potential exposure to hypothetical

---

[16] Or Const, Art IV, § 6(2)(c):

"If the Supreme Court determines that the measure does not comply with subsection (1) of this section, said measure shall be null and void, and the Supreme Court shall direct the Secretary of State to draft a reapportionment of the senators and representatives in compliance with subsection (1), and return the draft to the Supreme Court by October 1 of the same year. The Supreme Court shall review the draft thus returned to it and if it be in compliance with subsection (1), shall file it with the Governor prior to November 1 of the same year and it shall become law upon the date of filing."

recall proceedings. Nor are we at this point concerned with "disenfranchisement" or voting dates. Representation of a district by identifiable legislators does not necessarily imply single member districts, as the apportionments made before and within the 1952 reapportionment amendment show.

Whatever districts are created, however, the reapportionment must not result in a condition in which no member of the Senate can be identified as the senator for one of the districts.[17] This is what happened in the present reapportionment measure with respect to Senate District 6, and it renders the measure to that extent incompatible with Article IV, § 6(1) of the constitution.[18]

## Conclusion

To summarize: The question before the court is not whether the reapportionment made in 1981 Oregon Laws chapter 261 is desirable or undesirable. Nor is the question whether the criteria found in the Oregon Constitution are wise or unwise. Experience has shown that the formula stated in Article IV, section 6(1) cannot be followed literally, and that at best, any reapportionment faithful to all constitutional criteria is a difficult task. When the Legislative Assembly is able to achieve agreement in this difficult decennial assignment, that achievement is entitled to be respected if possible. This court does not inquire if a more nearly ideal apportionment could be designed, even assuming agreement on what is ideal. Our review is confined to whether the measure before us meets the constitutional criteria.

■ One criterion is the rule of equality of representation imposed by the federal 14th amendment. This can be

---

[17] The problem ordinarily is limited to the Senate if the redistricting measure, like chapter 261, becomes operative with the normal biennial election of all members of the House of Representatives.

[18] In this respect the position of the inhabitants of District 6 differs from that of other groups throughout the state who will miss a quadrennial senate election by virtue of the reapportionment. The main difference is not that this effect in District 6 involves a larger number of voters. Rather, unlike the inhabitants of other precincts that will not vote for a senator between 1978 and 1984, the inhabitants of District 6 are not incorporated in any electoral district for the representation of which an identifiable senator can be said to be "apportioned" within the meaning of section 6(1).

met in various ways, but it cannot be evaded. Nor can a redistricting measure evade Oregon's constitutional requirements respecting the apportionment of the number of senators and representatives "among" and "for" counties or districts, or the election of half the Senate every second year, or respecting county lines to the extent consistent with the requirements of numerically equal representation. The measure before us, chapter 261, achieved the goal of numerical equality within allowable percentages of deviation. It also achieved compliance with most other constitutional requirements. In doing so, it created 15 Senate districts that will elect new senators on the operative date of the measure, at the regular general election of 1982, and 14 other districts incorporating substantial parts of existing districts which elected senators in 1980. Senate District 6, however, is almost entirely composed of the present District 5, which last elected a senator in 1978, and it is not scheduled to elect a senator until 1984. Between 1982 and 1984 no identifiable senator will be expected or have reason to have any special representational relationship to Senate District 6 by virtue of election or appointment in that district, or by virtue of election or appointment in the predecessor District 5, or by virtue of designation in the reapportionment plan. For the reasons previously set forth, this lack of any senator identified with District 6 by election or appointment, by succession, or otherwise from the election of 1982 until the end of 1984 is incompatible with the constitutional assumption that the composition of the two legislative houses is matched to their respective electoral districts.

Some of the petitioners suggest that this flaw can be corrected by assigning a holdover senator to District 6, presumably in conjunction with an assignment of other senators from present to new districts as was done in the 1899 and 1907 reapportionments and in the 1952 reapportionment amendment, Article IV, § 6(4)(c), *supra,* and as also was done in HB 2001, *(supra* p. 670) before the action of the conference committee. Petitioner Botteri proposes that chapter 261 be corrected by restructuring Senate District 6, composed of House Districts 10 and 11, and Senate District 7, composed of House Districts 12 and 14, so as to combine House Districts 10 and 14 in Senate District 6 and House

Districts 11 and 12 in Senate District 7, on the premise that thereby each Senate District will succeed to the present district of a holdover senator. A variation of these ideas that makes District 6 part of a multimember senate district until 1984 is conceivable. There may well be other suggestions for correcting the flaw in chapter 261. None of them is presently at issue in this case. We mention them only to show that a correction is not impossible.

At this stage of the proceeding, the court's sole responsibility is to determine whether the reapportionment measure complies with section 6(1), and if not, to direct the Secretary of State to draft a reapportionment that does comply and return the draft to the court. By Oregon Constitution, Article IV, section 6(2)(c), the Secretary of State has until October 1, 1981, to return a draft of a reapportionment to the court, which the court by virtue of the same subsection will again review.

The measure does not comply with subsection (1) of Oregon Constitution, Article IV, section 6, and therefore is null and void. Secretary of State directed to prepare draft reapportionment and return draft to the Supreme Court by October 1, 1981.

**PETERSON, J.,** specially concurring.

I concur without reservation in the majority opinion, with this explanation. As pointed out on page 671 of the opinion, section 6 of HB 2001, as originally proposed and as passed in the House and Senate, matched one of the fifteen holdover senators to each new district electing a senator in 1984. This probably was intended to guarantee that every person in those districts would be represented by a senator from the second Monday in January, 1983, and continuing to the second Monday in January, 1985. Thus, half of the new senate districts would be represented by a senator elected at the 1982 general election; the remaining districts would be represented by the designated senators until January, 1985. But section 6 was deleted in conference committee and is not a part of chapter 261.

The parties appear to agree that it is impossible to avoid "pockets" of voters who will not vote in any senate race for six years, from 1978 to 1984.[1] Footnote 16 of the majority opinion refers to voters "who will miss a quadrennial senate election by virtue of the reapportionment" and concludes:

"* * * [U]nlike the inhabitants of other precincts that will not vote for a senator between 1978 and 1984, the inhabitants of District 6 are not incorporated in any electoral district for the representation of which an identifiable senator can be said to be 'apportioned' within the meaning of § 6(1)."

The parties also appear to agree that as to each of the other new 14 senate districts in which elections will be held in 1984, a presently-serving senator whose term expires in 1985 was, at the time of election in 1981, resident in what is now the new district. Although it does not appear from the face of chapter 261 that any senator has been "assigned" to any of the new districts, the parties appear to agree that as to all districts except District 6, a senator has, in a sense, been "apportioned" to the district. No issue has been raised as to the "apportionment" of these 14 districts. District 6 is the only district in Oregon which, between January, 1983, and January, 1985, will have neither a senator elected from the district nor a senator who, at the time of election, resided within the borders of the new district. The majority opinion requires that this be corrected, with the result that each of the fifteen districts will have (quoting from footnote 16), "an identifiable senator."

**TANZER, J.,** specially concurring.

I concur in the decision, but I do not join in the discussion regarding the nature of representation assured by the constitution. The opinion introduces the subject of

---

[1] For example, the brief of petitioners Ivancie, et al, states:

"Petitioners concede that any reapportionment, due to the need to adjust district boundaries, may result in some people having no Senate representation for two years. * * *"

It is probably more correct to say that, due to shifting populations, it is impossible to avoid, as to some voters, a six-year period between senate elections.

representation by acknowledging that it has numerous and contradictory meanings. That is because the term "representation" expresses a concept of political philosophy, not of law. A political observer can adjudge whether a legislator properly represents constitutents as a political matter, but it is impossible for a court to do so as a matter of law. The emphasis of the parties on the "right to representation" and the reference by the court to the "duty of representation" are inconclusive because those concepts are analytically soft. Hence, it is understandable that the opinion does not resolve the philosophical questions it poses regarding the nature of representation and it does not define as a matter of law any constitutional "right" or "duty" of representation.

In my view, the applicable political and legal concepts can and must be kept separate. Our constitution envisions a legislature which is representative politically because it is composed according to express legal requirements which are designed to assure political accountability of each legislator to the residents of a specific district which he or she "represents." Together, the districts comprise the state as a whole and the assembly of legislators representing those districts comprises a microcosm of the entire state. The mechanism to assure political representation of each district is in the legally enforceable constitutional requirements that districts be lawfully drawn, that legislators be assigned to each of them and that the residents of each district have the right to instruct, recall and vote out their legislators. Representation cannot be commanded by a court, but a court can enforce compliance with the constitutional requirements intended to assure political accountability. That is what we do today.

When the legislature is seen in its constitutional configuration as an assembly of legislators which is representative of the state because it is composed of legislators accountable to each district of the state, then the impermissibility of a legislature composed of legislators from less than all districts is obvious. The microcosm is incomplete. The legal defect is in the unlawful composition of the legislature, not in any denial of a right or a violation of a duty of representation. The constitutional requirements for

the composition of the legislature simply are not met if a part is missing.

For these reaons, I agree that a senator must be assigned to each district and that the reapportionment legislation is fatally defective for failure to do so.