Argued September 8, plan returned to Secretary of State
with instructions September 30, 1971

IN THE MATTER OF THE REVIEW OF 1971 REAPPORTION-
MENT OF OREGON RELATING TO SENATORS
AND REPRESENTATIVES.

HOVET ET AL, *Plaintiffs, v.* MYERS, *Defendant.*
489 P2d 684

*Jack B. Lively,* Springfield, argued the cause for petitioners. With him on the brief were Sanders, Lively & Wiswall, Springfield.

*Lee Johnson,* Attorney General, Salem, argued the cause in support of 1971 reapportionment of Oregon relating to Senators and Representatives. With him on the briefs was John W. Osburn, Solicitor General, Salem.

John R. Faust, Jr., Portland, filed a brief amicus curiae on behalf of Robert P. Aragon.

James E. Griffin, Portland, submitted a brief amicus curiae pro se.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, TONGUE, HOWELL and BRYSON, Justices.

DENECKE, J.

Petitioners have requested this court to review a plan for the reapportionment of the state legislature submitted by the Secretary of State.

In 1952 the people of Oregon adopted by initiative an amendment to Art IV, § 6, of the State Constitution known as the "Apportionment Enforcement Amendment." The Amendment provides that the legislature shall apportion the state legislature in the session following the federal census. If the legislature fails to reapportion itself, the Secretary of State is required to do so. The legislature failed to reapportion and the Secretary of State did submit a plan. The Apportionment Enforcement Amendment provides that this court has original jurisdiction to determine if the Secretary's plan complies with the Oregon Constitution.

■ While we are required by the Apportionment Enforcement Amendment to judge the Secretary's plan, our scope of decision is limited. "* * * [W]e are not privileged to substitute our judgment as to the wisdom of the plan of reapportionment submitted to us." *In re Legislative Apportionment*, 228 Or 575, 579, 365 P2d 1042 (1961). Our only function when exercising the original jurisdiction granted us by the Apportionment Enforcement Amendment is to determine if the plan complies with the Oregon Constitution, and, in this case, to determine if compliance is impossible because of the requirements of the Federal Constitution.

The petitioners do not contend the Secretary has violated the Federal Constitution. They urge that the Secretary has acted in violation of the apportionment

provisions of the Oregon Constitution, particularly Art IV, § 6 (1), and § 7. The Secretary admits he has not complied with the Oregon Constitution; however, he states that he cannot comply because of the requirements of the Federal Constitution. Petitioners' position is that the Secretary could meet the requirements of the Federal Constitution and still comply with the Oregon Constitution or, if that is impossible, the Secretary has no further power of reapportionment and the task of reapportionment should revert to the legislature.

We conclude that the Secretary cannot comply with the Oregon Constitution and still abide by the Constitution of the United States as the United States Supreme Court has recently interpreted the Constitution. When the Federal Constitution and the State Constitution conflict, the Federal Constitution must prevail. *Reynolds v. Sims,* 377 US 533, 584, 84 S Ct 1362, 12 L Ed2d 506 (1964).

The Oregon constitutional requirements for legislative apportionment are as follows: Art IV, § 2, provides that the maximum number of senators shall be 30 and of representatives shall be 60. These are the numbers we now have.

Art IV, § 6 (1), provides that the ratio of legislators shall be determined by dividing the total population of the state by the number of senators and representatives. This procedure establishes the "ideal number" of people to be represented. The section then provides: "The number of senators and representatives for each county or district shall be determined by dividing the total population for such county or district by such respective ratios [ideal number]; and when a fraction exceeding one-half results from such division,

such county or district shall be entitled to a member for such fraction. In case any county does not have the requisite population to entitle it to a member, then such county shall be attached to some adjoining county or counties for senatorial or representative purposes."

In construing this section we have used the phrases, "whole number" and "major fraction." *In re Legislative Apportionment*, 228 Or 562, 570, 364 P2d 1004 (1961). If dividing the legislative district's population by the ideal number results in a quotient of "one," that district has a "whole number." If the division results in a quotient of less than one but more than one-half, the district has a "major fraction."

When the total population of the state is divided by 30, the number of senators, the ideal number is 69,713; when divided by 60, the number is 34,856.

Art IV, § 3, provides, in part: "The senators and representatives shall be chosen by the electors of the respective counties or districts or subdistricts within a county or district into which the state may from time to time be divided by law."

Art IV, § 7, provides, in part: "A senatorial district, when more than one county shall constitute the same, shall be composed of contiguous counties, and no county shall be divided in creating such senatorial districts."

We interpret these provisions to require: (1) that county lines be adhered to; (2) that all counties entitled to a whole number or whole numbers of senators or representatives cannot be combined to form a district, but each of such counties is entitled to the number of legislators equivalent to whole numbers in the county; (3) that counties having a major fraction are entitled to one senator or representative, except that

major fractions can be adjusted consistent with the overall design, *In re Legislative Apportionment,* supra (228 Or at 573); (4) that counties with less than a whole number can be joined with other counties having a minor or major fraction or a whole number to form a district; and (5) only adjoining counties may be combined to form a district.

The requirement that counties having one or more whole numbers cannot be combined with each other to form a district is not stated expressly. We agree with the Secretary, however, that the language of §§ 3, 6 and 7, of Art IV, evidences a clear constitutional intent that counties entitled to at least one legislator are not to be combined with other similar counties to form a multi-member district. The petitioners have not argued to the contrary.

It was suggested that while counties with whole numbers could not be combined with other such counties, the Oregon Constitution may permit counties with whole numbers to be combined with counties with less than whole numbers and such a scheme could result in a low enough percentage of disparity to satisfy the Federal Constitution. Even if such a combination of counties is permitted by the Oregon Constitution, and we do not pass upon this issue, it would not satisfy the Federal Constitution. For example, Jackson County has a population of 94,533; by dividing 94,533 by the ideal number for representatives (34,356), we get a quotient of two representatives with 25,821 remaining. All counties adjoining Jackson County are entitled to at least one whole number; consequently, none of them can be combined with Jackson County. If Jackson County were allotted three representatives it would be overrepresented by 25 per cent; if it were only allotted two representatives, it

would be underrepresented by 75 percent. Other counties present a similar problem.

The equal protection clause of the Federal Constitution cannot be satisfied if an apportionment plan satisfies all of these Oregon requirements.

Following the Oregon Constitution, particularly the requirement of adherence to county lines, the closest that a plan can be devised to come to these ideal numbers of 69,713 in the senate and 34,365 in the house results in too great a disparity. In the case of the house, one district must necessarily have no more than 26,888 persons, which is 23 per cent less than the ideal number. One district must necessarily have 43,685 people, which is 25 percent more people than the ideal number. This is a total variation of 48 per cent. In the case of the senate the variation is from 14 per cent too few people in one district to 14 per cent too many people in another, a total variation of 28 per cent.

Petitioners' counsel stated at oral argument that he understood Senate Bill 470 complied with the Oregon Constitution and reapportioned the senators with only a total 9 per cent variation from the ideal. Assuming a 9 per cent variation is constitutionally permissible, we have examined Senate Bill 470 and found it deficient. The bill does not comply with the Oregon Constitution and because it is incomplete, it is difficult to determine the variation from ideal. At the least, it appears to have a variation of over 20 per cent.

The United States Supreme Court has not stated what variation from the ideal is permissible. It has held that a plan need not have all districts contain the same number of people. *Reynolds v. Sims,* supra (377 US at 577). On the other hand, it has also held

that any deviation from the ideal number must be justified by legitimate state considerations. *Abate v. Mundt,* 403 US 182, 91 S Ct 1904, 29 L Ed2d 399, 402 (1971).

In *Kirkpatrick v. Preisler,* 394 US 526, 89 S Ct 1225, 22 L Ed2d 519, 526 (1969), and *Wells v. Rockefeller,* 394 US 542, 89 S Ct 1234, 22 L Ed2d 535, 539 (1969), preservation of county lines was held not to be a sufficiently substantial state consideration to justify a total variation of 6 per cent in *Priesler* and 12 per cent in *Rockefeller.* Those cases involved apportionment of congressional districts, which the Court has said requires more equality than state or local government districts. A retreat from these standards may be suggested by *Abate v. Mundt,* supra (403 US 182), which approved a total 12 per cent variation. Town lines were observed in that case and were held to be one of the several legitimate state considerations present in that case.

■ Assuming *Abate* does indicate a trend, we do not believe that a state constitutional requirement to observe county lines in districting is a sufficiently strong state consideration to justify a 28 per cent variation in one house and a 48 per cent variation in the other.

Petitioners argue that if the Secretary cannot comply with the State Constitution, particularly Art IV, § 6(1), he has no further power to apportion and the task reverts to the legislature. Petitioners point out that the language granting the power of reapportionment to the Secretary states that the Secretary shall reapportion "in accordance with the provisions of subsection (1)." The petitioners reason that inasmuch as the Secretary cannot reapportion "in accordance with the provisions of subsection (1)" his

power is ended and the task of reapportionment reverts to the legislature.

We conclude that petitioners' argument is too literal and in conflict with the manifest intent of the people when they amended the Oregon Constitution in 1952, by initiative, entitled "Constitutional Legislative Senator and Representative *Apportionment Enforcement* Amendment." (Emphasis added.) The basic scheme is that if the legislature reapportions, any elector can require this court to review the reapportionment to determine if it complies with the Oregon Constitution; if it does not comply, the attempted reapportionment of the legislature is "null and void" and this court shall direct the Secretary of State to reapportion; his plan again can be reviewed by this court. If the legislature does not act, the Secretary of State is required to reapportion and his plan is subject to review by this court.

■ We construe the basic plan to be that if the legislature fails to act, or acts contrary to the Oregon Constitution, its power to reapportion passes to the Secretary of State. The Secretary of State is authorized to proceed in violation of the Oregon Constitution when that is necessary to satisfy the United States Constitution.

In addition to the basic scheme of apportionment enforcement leading to this conclusion, the wording of the entire initiative leads to the same conclusion. The section provides that when this court reviews an apportionment act passed by the legislature we shall determine whether the act "complies with subsection (1)." This is the same standard we are directed to use when reviewing the Secretary's plan. If the argument of petitioners were followed, this court would be required to hold a legislative apportionment invalid if

it did not comply with subsection (1). Under the enforcement amendment, the task would then go to the Secretary of State, but he also would be powerless. The result would be that the enforcement amendment would be of no effect.

The literal construction sought by petitioners would lead to other incongruous results. Other parts of Art IV, in addition to § 6 (1), concern reapportionment. Surely, the people intended that the Secretary would be limited by these provisions as well as those of subsection (1). However, if the words "in accordance with the provisions of subsection (1)" were construed literally, the Secretary could act unfettered by other constitutional requirements for apportionment.

■ Petitioners assert, however, that if the Secretary cannot apportion in compliance with the Oregon Constitution, the task of reapportionment should revert to the legislature because it has the inherent power to apportion, apart from any grant of power made in the apportionment enforcement initiative. Whatever may have been the legislature's inherent power before the apportionment enforcement initiative, that initiative measure turned apportionment over to the Secretary of State if the legislature failed to act. The initiative was framed so as to insure action and sending the job back to the legislature will not necessarily insure action. Petitioners state that action will be insured because we can require the legislature to act within a short period or the court itself can reapportion. In some states the courts have been required to reapportion; however, in Oregon the people have directed that if the legislature does not act, the Secretary of State shall, subject to the court's review.

Petitioners further attack the Secretary's submitting a plan contrary to the Oregon Constitution be-

cause petitioners contend that only the courts have the power to declare laws or State Constitutions invalid and the Secretary had no power to make that decision. There are circumstances in which a government officer has no right to challenge the constitutionality of a statute requiring him to act. The allowance of indiscriminate challenges would bog down the work of government. An example is the case cited by petitioners, *State ex rel Martin v. Zimmerman,* 233 Wis 16, 288 NW 454 (1938), in which the court held the Wisconsin Secretary of State could not refuse to carry out his statutory duty of publishing statutes enacted by the legislature. The Secretary contended legislative passage was accomplished in an unconstitutional manner. Duties such as publishing statutes are classified by the decision as "ministerial," meaning generally involving little discretion upon the part of the officer and not a "meaningful" step in the governmental process in which constitutionality should be tested. For examples see Rapacz, *Protection of Officers Who Act Under Unconstitutional Statutes,* 11 Minn L Rev 585, particularly at 597 et seq. (1927) ; and Field, The Effect of An Unconstitutional Statute, 129-134 (1935).

The Secretary in this case is not performing a "ministerial" act under any definition of that word.

■ After concluding that the Secretary does have the power to apportion even though he cannot comply with subsection (1) because it conflicts with the Federal Constitution, the question arises as to the extent of his power to apportion. Specifically, petitioners contend that the Secretary has no power to divide counties into single-member districts, but rather must submit a plan providing for county multi-member districts.

The Secretary's plan does divide populous

counties and areas whose boundaries roughly approximate county lines into single-member districts. He terms some of these areas "sub-districts," but they are in reality single-member districts.

As we have stated, the existing districts formed along county lines must be changed without regard to county lines in order to comply with the Federal Constitution. Apportionment is accomplished by changing legislative district lines and an integral part of apportionment is making a choice between fixing legislative district lines along a single-member district plan or a multi-member district plan. This is a decision that the legislature would have had to make if it had done the reapportioning. It must be made by the Secretary of State or whatever body makes the apportionment.

The United States Supreme Court decisions aptly reflect that the choice between single- and multi-member districts is an integral part of apportionment. *Connor v. Johnson,* 402 US 690, 91 S Ct 1760, 29 L Ed2d 268 (1971); *Whitcomb v. Chavis,* 403 US 124, 91 S Ct 1858, 29 L Ed2d 363 (1971).

The problem of apportionment is one of providing all people equal representation. The choice must be made whether equal representation will be obtained more by having a larger number of people represented by a large number of representatives or having a smaller number of people represented by a single representative.

The Oregon Secretary of State determined that equal representation was best obtained by having a smaller number of people being represented by a single legislator, that is, single-member districts. As stated, he labeled them subdistricts, but they are single-member districts because a single legislator is elected from

each of these areas. Political scientists are agreed that single-member districts are preferable. The United States Supreme Court has strongly stated its preference for single-member districts. In *Connor v. Johnson,* supra (402 US 690), a three-judge Federal District Court invalidated a Mississippi legislative reapportionment plan and issued its own reapportionment plan. The plan included a multi-member district with 12 representatives. The District Court stated it preferred single-member districts but it did not have time to divide the area into single-member districts because the last day for candidates to file was June 4. The United States Supreme Court believed that the single-member districts were so desirable that on June 3 it ordered the District Court to form single-member districts by June 14 and extended the candidates' filing time to that date.

The United States Supreme Court thus far has held that while multi-member districts are not desirable, they are not in violation of the Federal Constitution. *Whitcomb v. Chavis,* supra (29 L Ed2d 363). However, because of that Court's expressed aversion to multi-member districts, the Court might very conceivably, in the near future, change and declare multi-member districts invalid. The Secretary could legitimately consider this possibility and devise a plan with single-member districts and thus avoid the constitutional vulnerability of a multi-member district plan.

Petitioners contend that giving the Secretary of State the choice between single- and multi-member districts is putting too much power in one man; more than the people intended. The people did put this power in the Secretary; however, that power is not permanently granted. The people or the legislature can change any part of the Secretary's plan.

We hold that the Secretary has the power to create single-member districts.

The Secretary's plan contains no express residency requirements for legislators; however, the plan impliedly affects the residency requirement. The plan divides populous areas into single-member districts from which the single legislators must be elected. It lumps the single-member districts, sometimes called "subdistricts," into larger areas called "districts." For example, in Multnomah County the plan provides for eight single-member senatorial "subdistricts" and each two of these are joined in a larger area called a senatorial "district." No one is elected or represents these larger areas called "districts."

Section 8, Art IV, of the Oregon Constitution provides a legislator must, for a year preceding his election, be "an inhabitant of the county, or district whence he may be chosen. * * *." Because of this language, "county, or district," it appears that the only purpose to be served by the Secretary's creating these larger areas, called "districts," from which no one is to be elected, is to enable a legislator to live outside the area from whence he is elected. This may or may not be desirable, but it concerns residency.

■ A residency requirement for a legislator is not an integral part of an apportionment plan. Apportionment is a problem of numbers: how many people should a legislator represent? Residency does not involve that problem. We conclude, therefore, that the Secretary of State has exceeded the authority granted him by Section 6 when he created "districts" in his plan for the purpose of affecting residency.

All areas from which a legislator is elected should be designated "districts" rather than a "subdistrict." The areas designated "districts" and created

only for residency purposes are to be eliminated. Any "subdistricting" must be done by the people or by the legislature pursuant to §§ 3 and 7 of Art IV.

Pursuant to § 6 (3)(d), the reapportionment plan is returned to the Secretary of State with directions to correct the reapportionment in accordance with this opinion and to file the corrected reapportionment with the Governor.

O'CONNELL, C. J., specially concurring.

I specially concur for the purpose of explaining why I find Mr. Justice McALLISTER's position unacceptable and to register my disagreement with the majority opinion on the disposition of the residency problem.

Justice McALLISTER has agreed with the majority that Article IV, § 6 is to be construed as giving the Secretary of State the power to create districts which do not adhere to county lines. But it is his position that the Secretary was intended to have the power to create districts in this manner only to the extent that it was absolutely essential to do so in order to meet federal constitutional requirements as established by the U. S. Supreme Court.

His position is that the county lines must be followed to the extent possible, even though in doing so the apportionment plan so devised would be subject to the criticism that it was not the most desirable plan because it included multi-member districts rather than single-member districts, it being clear that a single-member district plan is preferable.

If, as is conceded, the people intended to permit the Secretary to disregard county lines to meet United States constitutional requirements, it is difficult for me to see why they would not have intended, once

county lines were necessary to be disregarded, that whoever is charged with devising a plan should devise the best possible plan to insure equal representation.

The dissenting opinion attaches to the integrity of county lines a significance which I am sure the people of this state did not intend them to have once it was necessary to disregard such lines for constitutional reasons. The unnecessarily rigid interpretation adopted by the dissent is unacceptable to me. Therefore, I concur in the majority opinion.

The majority opinion leaves undecided the question of the residence requirement under the Secretary's proposed plan. I think that we should decide the question because if the matter is not resolved those who wish to run for office to represent a so-called subdistrict (which is in fact a district) will not know whether or not they must be residents of the "subdistrict."

The controlling section of our constitution is Article IV, § 8, which provides that the legislator shall be "* * * an inhabitant of the county or district whence he may be chosen." It is apparent that this section contemplated a legislative district as consisting of either a single county or a combination of counties. Thus, residency in the county was required in the case of a single-county district, but residency in any county in the district was permissible in the case of multicounty districts. The purpose of Section 8 was to require the legislator to be an inhabitant *of the district from which he was elected.* Section 8 should be read to mean that the same principle applies where the district is an area less than a county. We should, therefore, hold that a legislator must be an inhabitant of the so-called "subdistrict" which he purports to represent.

McALLISTER, J., concurring in part; dissenting in part.

I concur in that portion of the majority opinion that holds that the Secretary of State may disregard the provisions of the Oregon Constitution insofar as necessary in order to make a reapportionment that will comply with the Constitution of the United States. I agree that in order to meet federal constitutional standards the Secretary of State was required in some instances to cut across county lines in forming legislative districts.

I dissent from that portion of the opinion which holds that the Secretary of State can, as a matter of political choice, create single member districts in every county entitled to more than one senator or representative, even though such single member districts are not essential to meet federal constitutional standards. In its latest reapportionment decision the Supreme Court of the United States has reiterated that multi-member districts are not constitutionally impermissible. *Whitcomb v. Chavis,* 403 US 124, 29 L Ed 2d 363, 91 S Ct 1858, June 7, 1971.

BRYSON, J., specially concurring.

I specially concur in the majority opinion of Mr. Justice DENECKE. The majority opinion states: "* * * however, the plan impliedly affects the residency requirement" and leaves a hiatus as to where legislators must live at the time of election to office. Art IV, Section 6, does not authorize this court to proceed to interpret and decide the residency requirements of a Senator or Representative in this proceeding. That has been decided by the people in adopting Art IV, Section 8, which reads as follows:

"No person shall be a Senator, or Representa-

tive who at the time of his election is not a citizen of the United States; nor anyone who has not been for one year, next preceeding (sic) his election an inhabitant of the county, or district whence he may be chosen. Senators and Representatives shall be at least twenty one years of age."

Thus, a Senator or Representative can be "an inhabitant of the county, or district whence he may be chosen."

It may well be that it is desirable for the legislator to "be an inhabitant of the district," but that is not what Section 8 of Art IV provides. That matter is not before us in deciding an apportionment plan. This can be decided at the proper time by the people or indirectly by the legislature, pursuant to subdistricting power provided in Sections 3 and 7 of Art IV (*See* ORS 171.043), or by a proper proceeding.