Argued and submitted October 2, the Ater, Bugas and Caballero petitions dismissed; the Paulk and Linder petitions granted; the reapportionment plan voided and returned to the Secretary of State with instructions October 15, 1991

Deanne ATER,
Mary Ann Buchanan, Sara Cogan, Del Greenfield,
Susan Hering, and Patricia Wessinger,
*Petitioners,*

*v.*

Phil KEISLING,
*Respondent.*

(SC S38475)

David LINDER
and Elisabeth Linder,
*Petitioners,*

*v.*

Phil KEISLING,
*Respondent.*

(SC S38476)

Theodore "Ted" BUGAS,
Jacqueline Taylor, Vickie Barrett, John McGowan,
Robert Miller, Gilbert Gramson, Richard Pearson,
Kirk Anderson, Noni Anderson, Doreen Dailey,
Patricia Garrett, Roger Berg, Margaret Forbes,
Janet Stevenson, Karen Beauchamp, Douglas Sweet,
Duane Jue, Diane Heintz, Karen Mellin and Duncan Law,
*Petitioners,*

*v.*

Phil KEISLING,
*Respondent.*

(SC S38477)

Vicki Ervin PAULK,
*Petitioner,*

*v.*

Phil KEISLING,
*Respondent.*

(SC S38478)

Carlos CABALLERO,
Judy A. Caballero and Susan E. Johnson,
*Petitioners,*

*v.*

Phil KEISLING,
*Respondent.*

(SC S38479)
(Consolidated)

819 P2d 296

Thomas A. Balmer, of Ater Wynne Hewitt Dodson & Skerritt, Portland, argued the cause and filed the briefs for petitioners Ater et al and petitioners Linder.

Thane W. Tienson, Portland, argued the cause for petitioners Bugas et al. With him on the brief were Richard L. Sadler and David N. Goulder, Portland.

Laurence Kressel, County Counsel for Multnomah County, for petitioner Paulk.

Carlos Caballero, Judy Caballero, and Susan E. Johnson, petitioners, filed a brief *pro se.*

Rives Kistler, Assistant Attorney General, Salem, argued the cause for respondent in the Ater petition. Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for respondent in the Bugas and Linder petitions. With them on the briefs in opposition to all petitions were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

PETERSON, J.

## PETERSON, J.

The Oregon Constitution requires that, following each federal decennial census, the "Senators and Representatives shall be * * * apportioned among legislative districts according to population." Or Const, Art IV, § 6(1). If the Legislative Assembly fails to enact a reapportionment, the task falls to the Secretary of State (Secretary). Or Const, Art IV, § 6(3). The 1991 Legislative Assembly failed to enact a reapportionment; therefore, the Secretary did so and filed his reapportionment plan with this court on August 14, 1991.

■     Original jurisdiction is vested in the Supreme Court "to review any reapportionment and the record made by the Secretary of State." Or Const, Art IV, § 6(3)(b). Five petitions challenging specific parts of the reapportionment plan were timely filed.[1]

Article IV, section 6(3)(a), of the Oregon Constitution directs the Secretary to "make a reapportionment of the Senators and Representatives in accordance with subsection (1) of this section and all law applicable thereto." Article IV, section 6(1) provides:

"At the regular session of the Legislative Assembly next following an enumeration of the inhabitants by the United States Government, the number of Senators and Representatives shall be fixed by law and apportioned among legislative districts according to population. A senatorial district shall consist of two representative districts. Any Senator whose term continues through the next regular legislative session after the effective date of reapportionment shall be specifically assigned to a senatorial district. The ratio of Senators and Representatives, respectively, to population shall be determined by dividing the total population of the state by the number of Senators and by the number of Representatives."

---

[1] Four of the five petitions were filed on or before September 15, the constitutional deadline for petitions for review of a reapportionment plan drafted by the Secretary pursuant to Article IV, section 6(3). The petition in *Caballero v. Keisling,* S38479, however, was filed on Monday, September 16. Because September 15 fell on a Sunday, the filing deadline was extended to the next regular judicial day, as in an ordinary civil matter. *In re Legislative Apportionment,* 228 Or 575, 577 & n 2, 365 P2d 1042 (1961) (ORS 174.120 applicable to proceedings arising under Article IV, section 6, of the Oregon Constitution); ORS 174.120 (1989); ORAP 1.25 (1991); ORAP 11.35(9) (1991). Thus, the *Caballero* petition was timely filed.

The petitioners seek review of the Secretary's plan on the ground that it fails to comply with section 6(1) "and all law applicable thereto." Or Const, Art IV, § 6(3)(a), (d).

■ The court's role in the reapportionment process also is prescribed by the constitution. Article IV, sections 6(3)(c) and (d) direct the court as follows:

"(c)   If the Supreme Court determines that the reapportionment thus reviewed complies with subsection (1) of this section [and[2]] all law applicable thereto, it shall dismiss the petition by written opinion on or before October 15 of the same year and the reapportionment shall become operative on October 15.

"(d)   If the Supreme Court determines that the reapportionment does not comply with subsection (1) of this section and all law applicable thereto, the reapportionment shall be void. The Supreme Court shall return the reapportionment by November 1 to the Secretary of State accompanied by a written opinion specifying with particularity wherein the reapportionment fails to comply. The opinion shall further direct the Secretary of State to correct the reapportionment in those particulars, and in no others, and file the corrected reapportionment with the Supreme Court on or before December 1 of the same year."

■ Initially, we note that Article IV, section 6, of the Oregon Constitution has been amended since the last reapportionment in 1981.[3] In particular, the phrase "and all law applicable thereto" was added to the former section, which had required a reapportionment only "in accordance with" or in "compl[iance] with subsection (1) of this section." *Compare* Or Const, Art IV, § 6(2)(b)-(d) and (3)(a), (c)-(e) (1989) (as amended in 1986) *with* Or Const, Art IV, § 6(2)(b)-(d) and (3)(a)-(d) (1985) (as effective from 1954 through 1986). Before the 1986 amendment, this court had held that its review was limited to ensuring compliance with Article IV, section 6(1). *See McCall v. Legislative Assembly,* 291 Or 663, 673, 634 P2d 223 (1981); *Cargo v. Paulus,* 291 Or 772, 777, 635 P2d 367 (1981); *In re Legislative Apportionment,* 228

---

[2] The "and" is necessary for the sentence to make sense. Its omission appears to have been unintentional given the context of the sentence and the remainder of the review provisions in Article IV, section 6. Or Const, Art IV, § 6(2)(b)-(d), (3)(d)-(e).

[3] Article IV, section 6, of the Oregon Constitution was amended by a referendum approved by the voters in the November 1986 general election.

Or 575, 579, 365 P2d 1042 (1961). In 1981, this court specifically rejected challenges based on ORS 188.010, which sets forth criteria for the Legislative Assembly and the Secretary to follow in making a legislative reapportionment, and held that

"our original jurisdiction under art IV, section 6(2) is to review a reapportionment measure for compliance with section 6(1), including such surrounding constitutional mandates as must be respected in the interpretation and application of subsection (1). ORS 188.010 does not purport to be an authoritative interpretation of constitutionally mandated standards." *McCall v. Legislative Assembly, supra,* 291 Or at 673 (footnote omitted); *Cargo v. Paulus, supra,* 291 Or at 777 (quoting *McCall*).

The 1986 constitutional amendment gives the court the authority found lacking under the previous version of Article IV, section 6, *i.e.,* to review the reapportionment for compliance with statutory as well as constitutional law.

■    This expansion of our scope of review is significant, because all five petitions challenging the reapportionment are premised on the Secretary's alleged failure to follow the criteria set forth in ORS 188.010(1).[4] That statute provides:

"The Legislative Assembly or the Secretary of State, whichever is applicable, shall consider the following criteria when apportioning the state into congressional and legislative districts:

"(1)   Each district, as nearly as practicable, shall:

"(a)   Be contiguous;

"(b)   Be of equal population;

"(c)   Utilize existing geographic or political boundaries;

"(d)   Not divide communities of common interest; and

"(e)   Be connected by transportation links."

---

[4] For example, the *Bugas* petitioners claim that the Secretary "fail[ed] to utilize existing political boundaries and not divide communities of common interest in creating House Districts 1 and 2" and that "alternative boundary lines [were] available * * * which would have satisfied the criteria set forth in ORS 188.010." The *Ater* petitioners claim that the Secretary "failed to utilize existing geographic and political boundaries and divided communities of common interest." The *Caballero* and *Linder* petitions make similar claims.

Although the scope of our review has been expanded to include ensuring compliance with statutes, *e.g.,* ORS 188.010(1), as well as the constitution, the nature of the court's task remains essentially the same. In 1961, this court interpreted the previous version of Article IV, section 6, and articulated its standard of review as follows:

"Article IV, Section 6 (2) (c) calls upon us to exercise our usual judicial function in passing upon the constitutionality of the plan submitted by the Secretary of State. In the exercise of that function we are not privileged to substitute our judgment as to the wisdom of the plan of reapportionment; we are obliged to sustain a reapportionment if it is in compliance with Article IV, Section 6 (1). As we indicated in our review of the original plan created by the legislative assembly, there is a broad discretion vested in the legislature in applying the constitutional formula for apportionment. There we stated that 'the legislature has the discretion to make any adjustment in the treatment of major fractions which is rational and consistent with the fundamental constitutional requirement that apportionment be made according to the population of the state in each county or district.' ([*In re Legislative Apportionment,* 228 Or 562, 573,] 364 P2d [1004,] 1008 [(1961)]). A similar breadth of discretion is vested in the Secretary of State in formulating his draft of reapportionment." *In re Legislative Apportionment, supra,* 228 Or at 579.[5]

Under Article IV, section 6, as amended, the court's task in this case is still to determine whether the reapportionment "complies";[6] it is not to substitute its judgment as to the wisdom of the plan.

In the past, this court has concerned itself primarily with questions of law in reapportionment cases. *See McCall v. Legislative Assembly, supra,* 291 Or at 674-76 (challenge to

---

[5] The changes made by the 1986 amendment to Article IV, section 6, of the Oregon Constitution included the elimination of the requirement that the legislators be apportioned among counties and of the language regarding the treatment of fractions in order to achieve that purpose. *Cf. Hovet v. Myers,* 260 Or 152, 489 P2d 684 (1971) (strict compliance with the subsection (1) formula was unnecessary where adherence to county lines would result in an apportionment in violation of the federal constitution); *In re Legislative Apportionment,* 228 Or 562, 573, 364 P2d 1004 (1961) (the legislature has the discretion to depart from the constitutional formula for the treatment of fractions where the formula is unworkable).

[6] Petitioners do not assert that the Secretary refused or failed to consider the constitutional or statutory factors in fashioning a plan.

the legislature's failure to ensure continued senatorial representation of all districts); *Cargo v. Paulus, supra,* 291 Or at 774 (challenge to the Secretary's authority to assign Senators to newly drawn districts); *Hovet v. Myers,* 260 Or 152, 159-62, 489 P2d 684 (1971) (challenge to the Secretary's authority to depart from the constitutional formula in order to comply with the federal constitution); *In re Legislative Apportionment, supra,* 228 Or at 570-71 (challenge to the legislature's departure from the constitutional formula for reapportionment). The present case, although it involves law in the sense that the Secretary's decision must be consonant with the constitution and statutes, also involves contentions of the parties relating to the specific factual criteria identified in the statute: What are the communities of common interest? What are the geographic and political boundaries? What are the transportation links?

The record contains information concerning the procedures followed by the Secretary and sets forth the reasons why he did what he did relative to the claims of the petitioners before us. In deciding those claims, we examine the decisions made by the Secretary in light of the record to determine whether the decision is consistent with the requirements of the constitution and ORS 188.010. Where it appears that the facts would permit more than one rational conclusion, we will uphold the Secretary's decision. *See In re Legislative Apportionment, supra,* 228 Or at 579 (the court does not substitute its judgment as to the wisdom of the plan). Where there is substantial support in the record for a particular factual finding, either made by the Secretary or implicit in his decision, we will apply that fact as the Secretary found it. Where the Secretary admits that an error was made, see section IV below, we normally will permit the Secretary to reconsider the matter and correct the error.

## I. THE SECRETARY'S SUBMISSION

Before holding a series of 15 public hearings around the state, the Secretary adopted eight guidelines to be followed in drafting the reapportionment. The guidelines are:

"1.   Aim for the ideal of zero population variance.

"2.   Honor existing geographic and political boundaries, with particular attention to county lines and maintaining

cities within a single district when possible.

"3.   Retain identified urban neighborhoods, rural communities, and other communities of interest within a single district, giving consideration to market areas covered by local media.

"4.   Make districts compact and contiguous.

"5.   Not dilute the voting strength of any language or ethnic minority group.

"6.   Not favor a party, incumbent or other person.

"7.   Provide for transportation links within a district, with at least a county road available from one population area to another.

"8.   Assure that two House districts are wholly contained within a Senate District."

In aiming "for the ideal of zero population variance," the Secretary made (and we quote from his transmittal letter accompanying the filing of the plan with this court) "a fundamental decision * * * that no district would vary from the ideal district size of 47,372 by more than plus-or-minus one percent."[7]

The Secretary also drafted a proposed reapportionment plan, to which individuals generally directed their testimony at the hearings. On August 14, the Secretary filed his reapportionment plan with the court. The Secretary's submission was in the form of a letter accompanied by 16 exhibits and the transcriptions of the 15 public hearings. The exhibits include a listing of the census blocks[8] that comprise each House district and the House district pairings that make up each Senate District, various maps, a narrative description of

---

[7] This decision was based in part on the advice of the Attorney General, who wrote to the Secretary as follows:

"Although I find the equal population goal to be primary, I cannot advise with certainty that the court would require the districts to have zero deviation (or de minimis deviation). The constitution also recognizes that the Secretary of State will apply state law to the redistricting plan. This is a recognition that other standards may apply. * * * The court may very well find that some sacrifice in population equality was necessary in order to achieve one of the other goals (such as maintaining communities of interest or geographic or political boundaries). Given the practical realities of the difficult task of redistricting, the court may be willing to permit some minimal deviation, if the deviation is justified as necessary to achieve another important goal."

[8] Census blocks are discussed in section IV below.

the districts, a summary of the main points made in the hearings and of the Secretary's responses, as well as an explanation of changes made to the final draft plan, an opinion letter from the Attorney General regarding the legal framework for the reapportionment, statistical analyses of the reapportionment plan, and a list of criteria used for the assignment of current House and Senate members to the new districts created by the plan.

## II. THE *ATER* AND *BUGAS* PETITIONS

The *Ater* petition was filed by six residents of northwestern Multnomah County, three of whom are also residents of the City of Portland. The petitioners contend that the reapportionment plan is not in compliance with Article IV, section 6(1), and ORS 188.010(1), because its assignment of their neighborhood to House District 7 rather than House District 11 fails to recognize (a) the community of common interest between the voters in the petitioners' neighborhood and the voters in adjacent District 11, an urban and suburban Portland district, and (b) their lack of common interest with the other voters in District 7, a rural and suburban district to which their neighborhood was assigned. Additionally, the petitioners contend that the reapportionment "arbitrarily and unnecessarily ignores the existing geographic and political boundaries of Multnomah County and the City of Portland." The petitioners claim that the Secretary's decision to adhere to the goal of strict population equality caused him to ignore or devalue the other statutory criteria, the appropriate application of which, the petitioners argue, would have resulted in their neighborhood's being assigned to House District 11.

The petitioners in *Bugas* are 20 individuals who reside in Columbia or Clatsop Counties. They argue that the Secretary's plan ignores the statutory criteria set forth in ORS 188.010(1) by failing to preserve existing geographic and political boundaries and by inappropriately and unnecessarily dividing communities of common interest within Clatsop and Columbia Counties. In particular, the petitioners challenge the Secretary's decision to create a district along the Columbia River that includes Astoria and separates Astoria from the remainder of the north coast. Petitioners seek to have the plan redrawn to place all of Clatsop County

within one district extending south into the northern portion of Tillamook County and east into the western portion of Columbia County.

The propositions underlying both the *Ater* and *Bugas* petitions are (1) that the Secretary was not required by statute or by either the state or federal constitution to adopt as strict a population deviation standard as he did and (2) that his decision to adopt the plus-or-minus one percent standard foreclosed adequate consideration of the other criteria set forth in ORS 188.010(1).

■ Article IV, section 6(1), provides that "the number of Senators and Representatives shall be fixed by law and apportioned among legislative districts according to population." Article IV, section 6(1) further provides that "[t]he ratio of Senators and Representatives, respectively, to population shall be determined by dividing the total population of the state by the number of Senators and by the number of Representatives." The Oregon Constitution speaks only of population as the basis for reapportionment. While absolute equality of population may be difficult or impossible to achieve, adoption of the plus-or-minus one percent standard certainly furthers the constitutional mandate, at least in the sense that it prevents deviations of more than one percent. The Secretary's decision to adopt the plus-or-minus one percent deviation standard was not irrational or contrary to the constitution.

■ The petitioners' argument that the federal constitution does not require strict population equality is beside the point. The question raised by the petitioners is whether the legislative districts as drawn by the Secretary are too equal, not whether they are equal enough. Additionally, because the constitutional mandate pursuant to which the Secretary acted speaks only of population as the basis for an apportionment, the Secretary reasonably could have believed that this court might interpret the Oregon Constitution to require a greater degree of equality than the standards under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. As this court noted in *Hovet v. Myers, supra,* 260 Or at 164, with regard to the possibility that multi-member districts would be held unconstitutional under the Fourteenth Amendment, "[t]he Secretary could

legitimately consider this possibility and devise a plan with single-member districts and thus avoid the constitutional vulnerability of a multi-member district plan." Likewise, the Secretary has the authority to interpret his mandate in a manner that minimizes the possibility of a successful state constitutional challenge to his reapportionment plan.[9]

■  The petitioners assert that ORS 188.010(1), as incorporated into the constitution by the phrase "and all law applicable thereto," requires that appropriate consideration be given to each of the five criteria listed in the statute without giving one criterion priority over the others. They contend that the Secretary's adoption of a criterion that no district would vary from the ideal district size of 47,372 by more than plus-or-minus one percent made it impossible to give enough consideration to the other four statutory criteria.

ORS 188.010(1) requires the Secretary to "consider" the five criteria listed and that, "as nearly as practicable," the districts conform to the five criteria. We view the statute as giving the Secretary — and the Legislative Assembly — latitude in applying the five criteria. Thus, where the statutory goals collide — *e.g.*, strict adherence to a geographical boundary might result in an apportionment that skews population equality — the reapportionment process necessarily requires some flexibility in application.

■  In essence, the petitioners ask us to second-guess the Secretary's decisions regarding the configuration of their legislative districts. That we will not do. We have reviewed the record and the reapportionment plan in light of the constitutional and statutory provisions. The record is replete with evidence that the Secretary did "consider" all five statutory criteria in arriving at the reapportionment decisions challenged in the *Ater* and *Bugas* petitions.[10] The choices that the

---

[9] Additionally, the petitioners in *Bugas* advance the argument that the Secretary's decision to adopt the plus-or-minus one percent population deviation standard resulted from his misconception that the constitution required him to do so. They argue that neither the state nor federal constitution required so strict a standard, and that the Secretary's decision to seek population equality more strict than the federal standard infected the rest of the apportionment process. The record shows that the Secretary's decision to adopt a plus-or-minus one percent population deviation standard was a choice based on a host of factors and not one the Secretary felt compelled to make.

[10] With regard to the challenge in *Ater,* the Secretary explained that achieving the goal of population equality required that approximately 15,000 Multnomah

Secretary made in drawing the district boundaries at issue in *Ater* and *Bugas* were consistent with Article IV, section 6(1), of the Oregon Constitution and ORS 188.010.

## III. THE *CABALLERO* PETITION

■     The *Caballero* petition challenges the choices made by the Secretary in drawing the boundaries of House District 27. The petitioners, residents of Aloha included in House District 27, would prefer to have been assigned to House District 6. Their petition is premised on the Secretary's alleged failure to follow the guidelines he had developed for the reapportionment process.

Like the petitioners in *Ater* and *Bugas,* the petitioners in *Caballero* are asking the court to second-guess the Secretary. We are satisfied that the Secretary fulfilled his constitutional duty by considering the criteria listed in ORS 188.010 in drawing the boundaries of House District 27.[11]

---

County residents be placed in predominantly non-Multnomah County House Districts and that the placement of petitioners' neighborhood was the best of the available choices. *See* Exhibit J2, "Explanation of Final Changes Made to the August 10, 1991 Final Draft Plan," at ¶ 6, Secretary's transmittal letter accompanying filing of reapportionment with the Supreme Court, August 14, 1991. The record shows that the petitioners' neighborhood is contiguous to House District 7 and more proximate to the bulk of the population in House District 7 than other neighborhoods that might have been placed there. *Id.* Also, the petitioners' neighborhood has strong transportation links to the remainder of House District 7 via Highway 26. *Id.*

With regard to the challenge in `Bugas,* the Secretary has explained that his decision to split up both Columbia and Clatsop Counties to create a "river" district, House District 1, and a rural-coastal district, House District 2, which are combined into Senate District 1, was the result of his balancing the statutory criteria. *Id.,* Exhibit J2, at ¶ 1. The Secretary concluded that neither Columbia nor Clatsop County could be maintained within a single district without splitting the other and creating serious difficulties in achieving the other statutory goals. *Id.* Further, the Secretary believed that Astoria's interests were more akin to those of the other communities on the river, which he believed share a strong community of common interest, than to the coastal communities of Clatsop County. *Id.* Additionally, the Secretary noted that "identifiable rural and coastal interests affect most of the residents of House District 2, including fisheries, tourism, timber production * * * and agriculture." *Id.* Finally, he noted that the use of east-west Highways 30 and 26 provided "substantially better" transportation links for House Districts 1 and 2, respectively, than would be available under other proposed plans for the region. *Id.*

[11] The configuration of House District 27 resulted in part from the Secretary's desire to preserve, as much as possible, the city boundaries of Tualatin, Lake Oswego, and West Linn, as opposed to the Clackamas-Washington County line, which the Secretary noted was not perceived as a meaningful dividing line in that area. The Secretary thus used a combination of city and county lines and geographic

## IV. THE *PAULK* AND *LINDER* PETITIONS

In conducting the census, the federal government divided the state into approximately 108,000 geographic units known as census blocks. The Secretary used the census blocks, units for which he was provided population information, as building blocks of his reapportionment plan.

The *Paulk* petition, filed by the Multnomah County Director of Elections, alleged that the Secretary's reapportionment plan is inconsistent with ORS 188.010, because certain district assignments fail to respect existing political and geographic boundaries and in some cases result in the assignment of census blocks to districts to which they are not contiguous. Specifically, because of an error made by the United States Census Bureau in identifying eight census blocks that are wholly within Clackamas County as being in Multnomah County, those eight census blocks were assigned to House Districts that are otherwise entirely within Multnomah County. The Secretary's response to the *Paulk* petition states:

> "The Secretary intended to respect the county line in the creation of these districts and could have done so without compromising population equality or any other statutory criterion. Therefore, the Secretary agrees that it would have been practicable to respect this existing political boundary and that the plan's failure to do so violates the terms of ORS 183.010(1)(c) [*sic*]. The court accordingly should void the apportionment and return the plan with instructions to assign these eight census blocks to the appropriate district."

Further, because of a failure of the United States Census Bureau to follow its own practice that census blocks be wholly within a single county, there is a ninth census block, which straddles the Clackamas-Multnomah County line that has been assigned to a district that is otherwise composed solely of Multnomah County residents. With regard to this census block, the Secretary acknowledges that he intended to observe county lines and could have done so without compromising population equality. As to this error, the Secretary notes:

---

boundaries to create a district with the requisite population and with sufficient transportation links.

"If the court returns the plan to correct the eight census blocks that are incorrectly included in Multnomah County, it would be appropriate to allow the Secretary to adjust the ninth census block if the USCB [United States Census Bureau] divides the block within the time for filing a revised plan."

Additionally, the Secretary states that an error in his computer program resulted in the assignment of six census blocks to districts to which they are not contiguous. Each of these census blocks is a "floating block"; it is an island within a district to which it was not, but apparently should have been, assigned. With regard to the six floating blocks, and any others that he might find, the Secretary states:

"None of the known floating blocks involves any population, and the Secretary does not anticipate that any other floating blocks he might find would have sufficient population to affect numerical equality if reassigned. These blocks were intended to be included in the surrounding districts, and assigning them to the surrounding district would not affect any statutory criterion. Therefore, the Secretary agrees that it would have been practicable to assign them to the surrounding district and that assigning them to non-contiguous districts violates the provisions of ORS 183.010(1)(a) [*sic*]. The Secretary also agrees that the court should void the apportionment and return the plan to the Secretary with instructions to assign all floating blocks to the appropriate districts."

The court accepts the Secretary's concessions and directs him to make the appropriate corrections to the reapportionment.

The *Linder* petition was filed by David and Elisabeth Linder, who are registered voters and residents of Multnomah County and the City of Portland. The petitioners reside in the 2100 block of Northwest Aspen Avenue in a neighborhood known as Willamette Heights. They and their two neighbors on Aspen Avenue have been assigned to House District 7, while all other residents of Willamette Heights have been assigned to adjacent House District 12. No more than ten residents on the 2100 block of Northwest Aspen Avenue are affected by this assignment.

The assignment of the Linders and their neighbors to House District 7, rather than House District 12, appears to

have been unintentional. The record prepared by the Secretary suggests that the Secretary intended that *all* residents of Willamette Heights be included in House District 12 and that he believed that his plan accomplished that goal. Seven witnesses testified that Willamette Heights should be in a "Portland" district, because it "shares an urban lifestyle, a political orientation and the transportation lines [and] is geographically isolated from House District 7." The record shows that the Secretary responded that this goal was "Met. Willamette Heights in District 12, along with much of remainder of NW Portland." *See* Exhibit J1, "A summary of the main points made in written oral testimony," at p 3 (Comments and Response), Secretary's transmittal letter accompanying filing of reapportionment with the Supreme Court, August 14, 1991.

But for the Secretary's erroneous belief that all of Willamette Heights had been kept undivided and assigned to House District 12, he may have drawn the district boundaries differently. The record suggests that, like the *Paulk* errors, the apparent factual error here was brought to the Secretary's attention after he filed his plan with this court. Because of this apparent error by the Secretary — similar though not identical to the errors referred to earlier in this section — it is appropriate to return the plan to the Secretary for further consideration.

## CONCLUSION

In summary, the *Ater, Bugas,* and *Caballero* petitions are dismissed. The Secretary's decisions with regard to the issues raised by those petitions were consistent with the constitution and applicable law. Specifically, with regard to *Ater* and *Bugas,* the Secretary's decision to adopt a population deviation standard of plus-or-minus one percent was not contrary to Article IV, section 6, of the Oregon Constitution or ORS 188.010 and did not foreclose adequate consideration of the other statutory criteria.

With respect to the *Paulk* petition, pursuant to the Secretary's concession, the court voids the reapportionment with regard to the district assignments of the eight misidentified census blocks and the six floating census blocks. The court also voids the reapportionment with regard to its

assignment of the straddling census block, Census Tract 1, Block 425.

With respect to the *Linder* petition, the court voids the reapportionment as it relates to the assignment of the Linders and their neighbors on the 2100 block of Northwest Aspen Avenue to House District 7.

The Secretary is directed to correct the errors in the reapportionment raised by the *Paulk* petition by reassigning the eight misidentified census blocks to the appropriate Clackamas district and the six floating blocks, and any other floating blocks that he has found or may find, to the district within which they are physically located. Further, with respect to the straddling census block, discussed in *Paulk,* and the assignment of the 2100 block of Northwest Aspen Avenue, raised by the *Linder* petition, the Secretary is directed to reconsider the district assignments in light of our discussion herein.[12]

The *Ater, Bugas,* and *Caballero* petitions are dismissed. The *Paulk* and *Linder* petitions are granted. The plan is voided and returned to the Secretary of State with instructions. The Secretary shall correct the reapportionment in the particulars discussed herein, and in no others, and shall file the corrected reapportionment with the court on or before December 1, 1991. Or Const, Art IV, § 6(3)(d).

**FADELEY, J.,** concurring in part and dissenting in part.

I concur fully in the disposition and opinions concerning the reapportionment cases but would go further. The dispositions of the petitions actually received challenging the Secretary's reapportionment are correct, and I concur in them. I dissent, however, from the majority's unwillingness to go further, because I perceive an additional difficulty with the Secretary's August reapportionment plan (the Plan). I

---

[12] The Secretary has asserted that the integrity of the census blocks must be preserved and that a census block should not be divided. Preservation of census blocks is not a statutory or constitutional criterion for reapportionment. Nor were census blocks referred to in the Secretary's "eight basic guidelines." We express no opinion as to whether the Secretary can or should split census blocks to achieve reapportionment consistent with the statutory criteria.

would direct a change in the abominable boundaries of House District 59 also.

After the Plan is returned by this court to the Secretary for correction, the Secretary appears to have no power to change any part of Plan unless the court directs that change specifically. Article IV, section 6(3)(d) of the Oregon Constitution, limits the Secretary's power of correction to "those particulars" that we spell out "and in no others."

On the other hand, while a petition for review is required to invoke our review, the governing constitutional provision does not limit this court's review to the subject matter or the articulated claims of any specific petition. Once invoked, original jurisdiction is vested in this court "to review any reapportionment and the record made by the Secretary of State" without limitation on that jurisdiction. Or Const, Art IV, § 6(3)(b). If this court determines that the reapportionment does not comply with the law, "the reapportionment shall be void." Or Const, Art IV, § 6(3)(d).

The constitutional criteria for that plenary review are whether the reapportionment complies "with subsection (1) of this section *and all law applicable thereto.*" Or Const, Art IV, § 6(3)(c),(d). (Emphasis added.)

Questions about the Plan's District 59 were raised at oral argument. The most substantial change in the configuration and size of a House district under the Plan, as compared with the way the district was constituted after the 1981 apportionment, is in District 59.

House District 59, in the Plan, stretches from the western bank of the Snake River at Farewell Bend, a little north of Ontario, to the south bank of the Columbia River in Wasco County just east of The Dalles. It is composed of seven whole counties east of the Cascades plus a portion of Wasco County that contributes only 1,456 persons to the 46,934 persons making up the 59th District in the Plan. (Exhibits N and L to the Plan.)

The distance in road miles from one end of the proposed House district to the other is comparable to a trip from Pendleton to Albany or from Milton-Freewater to French Glen, or from Klamath Falls to Beaverton, or from

Portland to the Medford-Ashland area, whether the District 59 traveler takes Interstate 84 or selects a route through Baker, John Day, Fossil, Clarno, and Antelope. Moreover, the district boundaries as drawn in the Plan divide Wasco County into three parts when there is no necessity to do so, because no other provision of law requires a triple division of that county.

The opinion of the majority, with which I concur, returns the Plan to the Secretary, in effect at his request, so that eight census tracts — which the Plan erroneously placed within Multnomah County, but which in fact are located in Clackamas County — may be transferred by drawing new House district boundaries so that those census tracts are part of Clackamas County House districts, not Multnomah County districts. The Secretary explains his request for return of the Plan to make this inter-county transfer as being because he wishes to honor the Multnomah-Clackamas County line, where he can do so, as he can here, without creating any excessive deviation in populations among the various House districts created by the Plan throughout the state.

The Secretary buttresses his request for the return of the Plan, so that he may honor county lines, by pointing to ORS 188.010. That statute mandates that one of the five criteria to "consider" in making a district reapportionment plan is to "[u]tilize existing geographic or political boundaries." ORS 188.010(1)(c). In my view, District 59 as presently proposed in the Secretary's Plan also fails to comply with that statutory provision.

In addition, the division of Wasco County into three parts under the Plan will of necessity place the three portions of Wasco County in more than one senatorial district. That is true because any senatorial district may only be composed of two House districts and the three parts of Wasco County are placed in three separate House districts under the Plan. ORS 188.010(4), echoing one of the constitutional purposes found in both Article IV, section 6(1) and section 7, provides: "Two state House of Representative districts shall be wholly included within a single senatorial district."

Multnomah County districts can absorb more population to make up for the loss of population to Clackamas County districts that results from the correction of the United States Census Bureau's error and still have less than the ideal population. That absorption permits movement of the eastern boundaries of the most eastern districts in Multnomah County a bit farther east beyond the eastern boundary of Troutdale.

No practical difficulties prevent moving the district lines for House District 59 to provide a more compact district, one that neither includes Wasco County as its western nether region nor splits that county into three parts. A clockwise shift of population among districts, made possible by the correction of the Multnomah-Clackamas boundary that the majority approves and the pre-existing *under* population of Multnomah County House Districts of over 2,500 persons in the Plan, will permit solution of the ORS 188.010(1)(c) and Article IV, section 6(1) and section 7, problems found in District 59.

Under the Plan, District 56 includes The Dalles in Wasco County, all of Hood River County, and that part of eastern Multnomah County east of Troutdale extending past Corbett and Bridal Veil Falls toward Hood River. This portion of Multnomah County, now lumped in with The Dalles-Hood River, contains 6,399 Multnomah residents. (Exhibit N.) When one or more of the Multnomah districts are moved east to pick up the population lost by the subtraction of the population of the census tracts properly belonging in Clackamas County, the Hood River-The Dalles district will have less population because of that shift and, therefore, can accommodate more population south of The Dalles in the area around Dufur, and east of The Dalles toward Biggs Junction, containing 1,456 people according to Exhibit N.[1]

However, District 59, even with the 1,456 persons residing in Wasco County census tracts contained within it,

---

[1] Another part of Wasco County is already in District 55 in the Plan, and District 55 contains less than the population ideal, as presently constituted. The northerly line of District 55 can be moved farther north to absorb the remainder of the high-plateau portion of Wasco County not absorbed by moving the portion of District 56 in that county east and south. Movements of that kind will clearly improve the compactness of District 59.

has no surplus of population. When it loses that number of Wasco County inhabitants, the Secretary would be faced with the problem of adding population from somewhere else to District 59, if he insisted upon having all 60 districts come within one percent of the mathematically ideal population.[2]

District 60, to the south of District 59 along much of District 59's great east-west expanse, has an *excess* population under the Secretary's Plan.[3] Population from proposed District 60 easily could be shifted to District 59. No problem with the statutory and constitutional language noted above will occur, because Districts 59 and 60 have been and may, under my suggestions, continue to be within the same senatorial district. Indeed, prior reapportionments approved by this court have included the area around Ironside (in overpopulated District 60 in the Secretary's Plan) within a district encompassing much of the area of District 59 as proposed in the Secretary's Plan.[4]

To summarize in a graphic fashion, the population loss to Multnomah County occasioned by correcting the census bureau error permits a clockwise shift of district boundaries picking up the population from other districts. Moreover, the current *under*population of Multnomah County House districts permits, even argues for, moving a portion of the population in Multnomah County east of Troutdale out of the Hood River-The Dalles district back into

---

[2] Neither the Attorney General nor this court, by its prior decisions, has required the one percent deviation limit. The Supreme Court of the United States has permitted substantially greater deviation in an approved state legislative plan, applying the strictures of the Fourteenth Amendment. As pointed out in the Attorney General's letter of August 2, 1991, to the Secretary of State:

"The federal constitution does not come into question, because the federal standards for population equality are not strict. Essentially, the state need not justify any deviations lower than 10%. *Gaffney v. Cummings,* 412 U.S. 735 (1973) and *White v. Regester,* 412 U.S. 755 (1973). In fact, in 1981 the Oregon Supreme Court upheld a plan which contained deviations in overall range *of 5.34% in the House districts and 3.73% in the Senate districts,* finding those to be within limits approved by the U.S. Supreme Court. *McCall v. Legislative Assembly,* 291 Or 663, 634 P2d 223 (1981)." (Emphasis added.)

[3] A population surplus of 377 persons is already found in House District 60 in the Plan. (Exhibit L to the Plan.) It has at least that many to spare to augment District 59 population.

[4] Donald Oakes of Ironside represented the Baker City area and, the John Day area in the House of Representatives during the 1970s. Oregon Blue Book, 1973-74, pp 89, 92.

a Multnomah district. By going clockwise, east, this shift can be continued so that all of the boundaries are shifted eastward and then, when one reaches District 59, as described in the Plan, by continuing the clockwise shift in a southerly direction to pick up population around Ironside sufficient to keep the population balance of District 59 within tolerable deviation limits, a deviation much smaller than those that this court approved in prior apportionments.

I would specifically order the Secretary of State to make those changes to correct the abominable boundaries of House District 59 in the Plan.

## APPENDIX

It is suggested in some quarters that section 7, still printed in our constitution, is a dead letter. Various reasons have been given to support this suggestion. One is the thought that the 1986 amendment works an implied repeal of all or parts of section 7. Another is that part of the protection of county integrity contained in the constitution simply will not work as long as population equality is given primary weight and, thus, may be ignored in construing the reapportionment provisions as a whole. The latter reasoning invokes this court's holding in *Hovet v. Myers,* 260 Or 152, 489 P2d 684 (1971). That holding renounced the 1971 legislative reapportionment plan and directed that it be corrected on the grounds that it permitted a level of district population inequality — 28 percent deviation in population between districts in one house of the legislature and a 48 percent deviation in the other — that could not be sustained under the interpretation of the federal Fourteenth Amendment found in state reapportionment cases theretofore decided by the Supreme Court of the United States. *Id.,* 260 Or at 159. These suggestions are not persuasive.

The *Hovet* opinion does not expressly, or by necessary implication of any words used in the opinion, override ORS 188.010(1)(c) or rip section 7 out of our constitution and discard it. Moreover, *Hovet* concerned what was *necessary* under the Fourteenth Amendment, in the view of this court in 1971, to avoid very substantial disparities in the population among legislative districts established by the 1971 reapportionment. We have before us in 1991 a totally different plan, one which strives to and does achieve a variation of less than one percent, plus or minus, from the ideal population goal obtained by dividing the number of legislative districts into the population count of the entire state.[5] Following the 1981 reapportionment, the court rendered decisions about it in *McCall v. Legislative Assembly,* 291 Or 663, 634 P2d 223 (1981), and *Cargo v. Paulus,* 291 Or 772, 635 P2d 367 (1981).

---

[5] Indeed, the Secretary's Plan provides district population equality much more nearly than has any past reapportionment plan. The *average* deviation plus and minus from the ideal population figure is only .56 of one percent. The shifts proposed herein, *ante,* will leave the maximum House deviation between the most and least populous districts well below three percent and the average deviation well under one percent.

The 1981 decisions do not mention section 7. After these decisions, the people amended only section 6 of Article IV, leaving section 7 intact and still printed as a part of our existing constitution. 12 ORS C-14 (1989). The necessity rationale fails, because there is no necessity to divide Wasco County into three parts.